[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 17-10639

_____

D.C. Docket No. 1:13-cr-00441-TCB-CMS-1

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

QADIR SHABAZZ,
a.k.a. Deangelo Moore,
a.k.a. Deangelo Muhammad,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(April 18, 2018)

Before WILLIAM PRYOR, JULIE CARNES, Circuit Judges, and CORRIGAN,[*]
District Judge.

WILLIAM PRYOR, Circuit Judge:

---

[*] Honorable Timothy J. Corrigan, United States District Judge for the Middle District of Florida,
sitting by designation.

Qadir Shabazz orchestrated a multi-state tax-fraud scheme using Indigent Inmate, a prisoner "charity" he founded and financed. Prisoners interested in receiving financial support, religious materials, and other assistance items completed applications that required them to provide personal identifying information. Shabazz and his associates then used that information to submit fraudulent tax returns and collect fraudulent tax refunds. This appeal requires us to decide several questions about Shabazz's convictions and sentence for conspiracy, wire fraud, aggravated identity theft, and theft of government funds: (1) whether the district court clearly erred when it admitted evidence seized from Shabazz's clothing during the execution of a search warrant as well as Shabazz's post-arrest statements; (2) whether the district court abused its discretion when it admitted evidence of uncharged conduct and photographs of Shabazz and his wife with large sums of money; (3) whether the district court violated Shabazz's right not to wear jail clothes after he waived his right to appear in street clothes; (4) whether the district court erred when it instructed the jury about conspirator liability under *Pinkerton v. United States*, 328 U.S. 640 (1946); (5) whether sufficient evidence supports Shabazz's convictions for conspiracy and aggravated identity theft; and (6) whether the district court erred when it calculated Shabazz's Sentencing Guidelines range or imposed a substantively unreasonable sentence. We affirm Shabazz's convictions and sentence.

2

## I. BACKGROUND

From 2009 to 2012, Qadir Shabazz used Indigent Inmate, a "charity" he founded and financed, to defraud prisoners throughout the country. According to the "Member Handbook," the nonprofit served "to aid and assist those who are incarcerated" by "provid[ing] inspirational literature, news paper [sic] subscriptions and financial assistance to those in need." But the evidence at trial established that the nonprofit instead served to enrich Shabazz and his associates at the expense of inmates seeking assistance.

Employees of Indigent Inmate mailed prisoners applications that requested their personal identifying information, including their social security numbers and dates of birth. One employee of Indigent Inmate testified that she marked applications "disqualified" if they indicated that applicants had student loans, owed child support, or listed an incorrect Social Security number or booking number. Members of the conspiracy then used the personal identifying information to file fraudulent income tax returns seeking tax refunds. And they formed corporations in the names of applicants to allow the conspirators to access the funds. For example, Shabazz or one of his coconspirators created a corporation in the name of William Malone, Inc., created a William Malone, Inc., account, deposited a fraudulently obtained refund check issued to William Malone, an Indigent Inmate applicant, into that account, and wrote a check drawn on that account to Shabazz.

3

Investigators also found a debit card for the account in Shabazz's wallet. Similarly, a corporation was created in the name of another Indigent Inmate applicant, Sandra Oyawusi, and investigators found a debit card for that account in another one of Shabazz's wallets.

Shabazz professed to have four wives—at least two of whom helped him with the day-to-day operations—but Shabazz was in charge of Indigent Inmate. For example, forms filed with the Georgia Secretary of State listed Leslie Scott— also known as Leslie Shabazz—as the CEO and registered agent of the company. And Sheena Shabazz directly managed some, if not all, of the employees. But Qadir Shabazz rented the office space, hired employees, paid the employees, and held himself out as the president.

The investigation of the scheme began in Pennsylvania. Agents from the Pennsylvania Attorney General's Office and Pennsylvania Bureau of Revenue began investigating fraudulent state tax returns that listed 2615 Brownsville Road, Pittsburgh, Pennsylvania, as the taxpayer address. The agents discovered that one of Shabazz's associates, Dion McBride, was involved in a prisoner tax-fraud scheme, and McBride later informed the agents that Shabazz was responsible for that scheme.

After further investigation, the agents obtained search warrants for a residence at 2864 Cheney Street, East Point, Georgia and the Indigent Inmate

4

headquarters at 1677 Dorsey Avenue, East Point, Georgia. To establish probable cause, the search-warrant affidavit detailed evidence of the involvement of Shabazz and his wives. That evidence included not only McBride's statements, but also bank records, phone records, and surveillance records.

Shabazz and Leslie Shabazz were present at the Cheney Street address when the agents arrived to execute the warrant. Because Shabazz was wearing only boxer shorts and a T-shirt, an agent located a pair of pants at Shabazz's direction, confirmed with Shabazz that the pants were his, and emptied the pockets. The agent then discovered and seized a number of credit cards and identification cards that were in a wallet in one of the pockets. One of those cards was the debit card for the William Malone, Inc., bank account.

The agents also executed the search warrant for the Indigent Inmate headquarters at the Dorsey Avenue address. They seized 12 boxes of completed Indigent Inmate applications and approximately 20 computers on which investigators discovered over 90 fraudulent tax returns. Pennsylvania agents created a spreadsheet with the information obtained from the completed applications and sent the spreadsheet to the Internal Revenue Service. An investigative analyst recorded the information in an electronic master file of tax-return filings and noticed that 15 mailing addresses were repeatedly listed on the returns. She then created a summary spreadsheet that showed the number of returns

filed and the refund amount requested for the 15 addresses. More than 2,000 tax returns included prisoner information from the Indigent Inmate files and listed one of the 15 common addresses.

The evidence established a number of connections between Shabazz and the fraudulent returns. He was directly or indirectly connected to 11 of the 15 addresses. For example, Shabazz leased four of the addresses: 2945 Orr Drive, 1677 Dorsey Avenue, 1782 Neely Avenue, and 1447 Walker Avenue. And like many of the fraudulent returns introduced at trial, Shabazz's 2009 tax return claimed large car and truck expenses and falsely listed Revco Discount Drug Centers, Inc., as his employer.

Pennsylvania agents arrested Shabazz and interviewed him twice. Shabazz maintains that he never received a warning and never waived his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966). But the agents testified that they provided Shabazz with a *Miranda* warning, though they could not produce a signed waiver form or recording to corroborate their account. According to one of the agents, Shabazz told them during the interviews that he "ran an operation or a company known as Indigent Inmate[]," that "Dion McBride was making him out to be the mastermind of the [tax-fraud] operation, but he wasn't," and that "there were other people involved in the Pittsburgh area."

6

Before trial, Shabazz moved to suppress his post-arrest statements on the ground that the agents failed to provide a *Miranda* warning. The magistrate judge credited the contrary testimony of the agents, and the district court adopted the magistrate judge's report and recommendation. The district court explained that the two agents "offered consistent, detailed testimony of the events . . ., giving similar accounts of the interviews." In contrast, Shabazz "could not recall how [one] interview concluded and could not even recall meeting with the agents twice." It also explained that "Shabazz ha[d] a prior conviction for fraud, which further call[ed] into question his credibility."

Shabazz moved to suppress the contents of his wallet on the ground that the search-warrant affidavit for the Dorsey and Cheney Street addresses did not establish probable cause. The magistrate judge concluded that the affidavit was not deficient, and the district court again adopted the magistrate judge's report and recommendation. It explained that Shabazz's argument that the warrants were "based solely upon [statements by] persons with an interest in the case as defendants, e.g. Dion McBride" was unpersuasive because "[t]he affidavit[] also refer[red] to evidence gathered from other sources such as transaction records, phone records, websites[,] and surveillance." And the affidavit "recite[d] steps that investigators took to corroborate McBride's statements, including contacting a hotel where Shabazz stayed in 2010 and 2011."

7

Shabazz also unsuccessfully opposed a pretrial motion by the government to admit fraudulent tax returns that were not alleged in the indictment. The district court ruled that the evidence was admissible under *United States v. Ford*, 784 F.3d 1386 (11th Cir. 2015). In *Ford*, we affirmed the admission of evidence of uncharged conduct intrinsic to a tax-fraud scheme. *Id.* at 1394.

At trial, the government introduced evidence of Shabazz's involvement in the scheme. It called several victims, and it introduced fraudulent tax returns that were both charged and not charged in the indictment. And the district court admitted, over objection, a set of photographs of Shabazz and Leslie Shabazz with large amounts of cash. After the government explained that the pictures were "relevant to the issue of whether or not [Shabazz] had, in fact, received illicit proceeds," the district court ruled that "they [were] relevant" and "d[id] tend to prove a fact in dispute." Shabazz also testified and denied any involvement in the fraudulent scheme.

On the second day of trial, Shabazz objected to wearing his prison clothes. He entered the courtroom in his prison jumpsuit and explained to the district court that he was wearing the jumpsuit because the marshals had not allowed him to take his legal work with him at the end of the previous day of trial. He stated, "I can't take my legal work with me, because I am in jail. So why I come in here and front like I'm not[?]"

8

The district court explained to him that it was "[his] choice" "to wear those clothes," but it reminded him that he did not "have to wear them" and warned him that "it [wa]s a dangerous and mistaken notion to wear them because . . . it sends the wrong signal to the jury." It stated, "There is a reason that criminal defendants are not required to wear prison garb during trials, and it is because, for some people, that will create a presumption of guilt." It also stressed that it did not "mind taking the time for [Shabazz] to put [his] suit on."

Shabazz declined the opportunity to change his clothes. The district court then stated, "Mr. Shabazz has elected to remain in his orange jumpsuit[,] which is his right, but I am going to instruct the jury when they come in that they should not infer anything regarding guilt or innocence because of his wearing [it]." Shabazz's counsel did not object.

Shabazz's counsel expressed concern about the clothing only *after* the jury entered the room. At a sidebar conference, counsel told the district court, "Well, as the jury walked out, [Shabazz] said he want[ed] to put the suit on." The district court refused to allow Shabazz to change. It explained that "the jury ha[d] already seen him in the orange jumpsuit, and he . . . waived his right when he said no, and [the district court] called the jury back in. He c[ould]n't recall the jury after the jury c[a]me[] in and [change his] mind . . . ." It then gave a limiting instruction as promised.

9

At the end of the trial, the district court instructed the jury, over Shabazz's objection, about the rule of conspirator liability established in *Pinkerton v. United States*, 328 U.S. 640 (1946). And the jury convicted Shabazz of all counts: one count of conspiracy to defraud the government, 15 counts of wire fraud, 15 counts of aggravated identity theft, and two counts of theft of government funds.

At sentencing, the district court heard arguments about issues related to the calculation of Shabazz's Sentencing Guidelines range. It rejected Shabazz's argument that he did not qualify for a role enhancement because he did not exercise control over other members of the conspiracy. It stated that it could not "say that he did not exercise control over them" and that it "th[ought] he d[id] satisfy the enhancement's definition or description of one as an organizer or leader of criminal activity." It also ruled that the government had "proved at trial sufficiently, beyond a preponderance of the evidence," that it was appropriate to calculate the intended loss amount by considering tax returns that were filed in the names of Indigent Inmate applicants and listed one of the fifteen common addresses—regardless of whether the evidence established that Shabazz was directly or indirectly connected to the addresses.

The district court sentenced Shabazz to 277 months of imprisonment, five years of supervised release, a special assessment of $3,300, and restitution totaling

10

$1,680,299. The sentence was below Shabazz's Sentencing Guidelines range, which was 292 to 365 months.

## II. DISCUSSION

Shabazz raises multiple objections to his trial and sentence. None has merit. We review and reject each of his arguments in turn.

### A. *The District Court Did Not Err when It Admitted Evidence Seized from Shabazz's Clothing as well as Shabazz's Post-Arrest Statements.*

Shabazz argues that the district court erred when it denied his motions to suppress the contents of his wallet as well as his post-arrest statements. We have explained that "[a] ruling on a motion to suppress presents a mixed question of law and fact." *United States v. Johnson*, 777 F.3d 1270, 1273–74 (11th Cir. 2015) (quoting *United States v. Virden*, 488 F.3d 1317, 1321 (11th Cir. 2007)). We review findings of fact for clear error, and we review the application of the law to the facts *de novo*. *Id.* at 1274. We must construe all facts "in the light most favorable to the party prevailing below," which, in this appeal, is the government. *Id.* (quoting *Virden*, 488 F.3d at 1321). But "when an argument is first raised on appeal, we review the argument for plain error." *Id.* The district court did not err.

### 1. The Contents of Shabazz's Wallet

Shabazz challenges the admission of a debit card and the other contents of his wallet, which were seized during a search of the residence at the Cheney Street address. When the agents arrived to execute the search warrant, Shabazz was

11

wearing boxer shorts and a T-shirt. He directed the agents to a pair of pants, and they handed the pants to him after they emptied the pockets. They then seized the contents of the wallet they found, including a debit card in the name of William Malone, Inc. As he did before the district court, Shabazz argues that the contents of the wallet should not have been admitted at trial because the search-warrant affidavit did not establish probable cause. He also makes two novel arguments on appeal: that the wallet was outside the scope of the search warrant and that the search was impermissible under *Terry v. Ohio*, 392 U.S. 1 (1968). We are not persuaded.

We must "give 'great deference' to a . . . determination of probable cause [by a district court]." *United States v. Brundidge*, 170 F.3d 1350, 1352 (11th Cir. 1999) (alteration adopted) (quoting *United States v. Gonzalez*, 940 F.2d 1413, 1419 (11th Cir. 1991)). To "establish a finding of probable cause," *United States v. Martin*, 297 F.3d 1308, 1314 (11th Cir. 2002), a search-warrant affidavit need only contain "sufficient information to conclude that a fair probability existed that seizable evidence would be found in the place sought to be searched," *id.* (quoting *United States v. Pigrum*, 922 F.2d 249, 253 (5th Cir. 1991)). "[T]he affidavit should establish a connection between the defendant and the residence to be searched and a link between the residence and any criminal activity." *Id.*

12

The search-warrant affidavit recounted ample evidence to establish probable cause to search the Cheney Street address. Shabazz argues that the affidavit was based on the "unreliable and uncorroborated statements of Dion McBride," which were "insufficient to provide probable cause." But, as the district court explained, the statements by McBride *were* corroborated. And "when there is sufficient independent corroboration of an informant's information, there is no need to establish the veracity of the informant." *Id.* (alteration adopted) (quoting *United States v. Danhauer*, 229 F.3d 1002, 1006 (10th Cir. 2000)).

The affidavit detailed an exhaustive list of evidence confirming McBride's statements about Shabazz's involvement in the tax-fraud scheme. For example, surveillance confirmed that "McBride and/or [Shabazz]" used three known addresses to receive fraudulent tax returns. Transaction records established that they obtained debit cards using the identities of inmates. Hotel records and Shabazz's bank records confirmed that Shabazz frequently traveled to Pittsburgh, where McBride lived, for the purpose, according to McBride, of picking up fraudulently issued debit cards. A review of bank records established that, when Shabazz returned to Georgia, withdrawals from automated teller machines were made in Atlanta using the fraudulently issued debit cards. Records from bank accounts controlled by McBride established that McBride received more than $7,000 in wire transfers from Shabazz. Surveillance videos showed Leslie Shabazz

13

withdrawing money from automated teller machines using fraudulent cards. Records from the Georgia Department of Corporations listed Leslie Shabazz as the registered agent for Indigent Inmate. Records from the Georgia Department of Transportation established that Leslie Shabazz resided at the Cheney Street address. An agent observed Shabazz's vehicle at the Cheney Street address. And significant evidence corroborated McBride's statements about his own involvement in the scheme. This evidence connected Shabazz and Leslie Shabazz to the residence and the residence to the criminal activity.

Shabazz argues that the search of his wallet was outside the scope of the warrant, but we disagree. The search warrant permitted the agents to seize "Green Dot [d]ebit [c]ards, other [automated-teller-machine] cards, [g]overnment identification cards, computers, routers, hard drives, papers, receipts, portable electronic storage devices, [c]urrency, and other items commonly associated with criminal activity involving fraud." And "[a] lawful search of fixed premises generally extends to the entire area in which the object of the search may be found and is not limited by the possibility that separate acts of entry or opening may be required to complete the search." *United States v. Ross*, 456 U.S. 798, 820–21 (1982). Because the pockets of a pair of pants are a reasonable place to look for debit cards and some of the other kinds of evidence identified in the search warrant, the agents did not exceed the scope of the search warrant when they

14

seized the contents of Shabazz's wallet. And the search of the pants was not a frisk to protect an officer's safety, which would "restrain[] the freedom of the detainee to walk away or otherwise remove himself from the situation." *Moore v. Pederson*, 806 F.3d 1036, 1044 (11th Cir. 2015). Shabazz was not wearing the pants when the agent seized the wallet, so he was physically able to walk away at any time. The district court did not err.

## 2. Shabazz's Post-Arrest Statements

Shabazz argues that the district court clearly erred when it agreed with the magistrate judge and credited the testimony of two agents who stated that they gave Shabazz a *Miranda* warning. "We accord great deference to [a] district court's credibility determinations." *United States v. Gregg*, 179 F.3d 1312, 1316 (11th Cir. 1999). And in circumstances where "the officers' testimonies are in direct conflict with [the defendant's] testimon[y], various courts have held that a 'trial judge's choice of whom to believe is conclusive on the appellate court unless the judge credits *exceedingly* improbable testimony.'" *United States v. Ramirez-Chilel*, 289 F.3d 744, 749 (11th Cir. 2002) (alteration adopted) (quoting *United States v. Cardona-Rivera*, 904 F.2d 1149, 1152 (7th Cir. 1990)). We must accept the evidence credited by the district court "unless it is contrary to the laws of nature, or is so inconsistent or improbable on its face that no reasonable factfinder

15

could accept it." *Id.* (quoting *United States v. Eddy*, 8 F.3d 577, 580 (7th Cir. 1993)).

Although it would have been better practice for the agents to have recorded Shabazz's waiver, their testimony was far from "exceedingly improbable." *Id.* (emphasis omitted) (quoting *Cardona-Rivera*, 904 F.2d at 1152). Shabazz underscores that the police report did not state that either agent recited a warning and that the agents could not produce a signed waiver, recording, or other "contemporaneously created record" of the interview. But the district court explained that one agent's testimony that he inadvertently left the warning out of his report was not "improbable or suspicious." And it stressed that the two agents "offered consistent, detailed testimony [about] the [interviews]." In contrast, Shabazz "could not recall how [one] interview concluded and could not even recall meeting with the agents twice." And Shabazz "ha[d] a prior conviction for fraud, which further call[ed] into question his credibility." The absence of corroborating evidence, standing alone, does not permit us to reverse the credibility determination by the finder of fact. The district court did not clearly err.

### B.  The District Court Did Not Abuse Its Discretion when It Admitted Evidence of Uncharged Conduct and Photographs of Shabazz and Leslie Shabazz with Large Sums of Money.

Shabazz challenges the admission of evidence of uncharged conduct and the photographs of him and his wife with large sums of money under Federal Rules of

16

Evidence 401, 403, and 404. We review rulings on the admissibility of evidence for abuse of discretion. *Ford*, 784 F.3d at 1392. We have stressed that, under Rule 401, the district court possesses "broad discretion to admit evidence if it has any tendency to prove or disprove a fact in issue." *United States v. Smith*, 459 F.3d 1276, 1295 (11th Cir. 2006) (quoting *United States v. Norton*, 867 F.2d 1354, 1361 (11th Cir. 1989)). That discretion is subject only to narrow statutory and constitutional caveats. Rule 404(b) provides that "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with th[at] character." Fed. R. Evid. 404(b)(1). And Rule 403 provides that a district court "may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. But we have underscored that Rule 403 "should be used only sparingly" and that we must "look at the evidence in a light most favorable to its admission, maximizing its probative value and minimizing its undue prejudicial impact." *Smith*, 459 F.3d at 1295 (citations and internal quotation marks omitted).

The district court did not abuse its discretion. Neither Rule 404(b) nor Rule 403 barred admission of the disputed evidence. Both the evidence of uncharged conduct and the photographs were admissible.

17

### 1.  The Evidence of Uncharged Conduct

Shabazz argues that the uncharged tax returns and the victims' testimony about uncharged conduct were inadmissible under Rule 404(b). The admissibility of evidence of uncharged conduct depends on whether the evidence is extrinsic or intrinsic to the charged offense. If the evidence is "(1) an uncharged offense which arose out of the same transaction or series of transactions as the charged offenses, (2) necessary to complete the story of the crime, or (3) inextricably intertwined with the evidence regarding the charged offenses," then it is admissible as intrinsic evidence as long as it satisfies the requirements of Rule 403. *Ford*, 784 F.3d at 1393 (alterations adopted) (citation and internal quotation marks omitted). On the other hand, if the evidence is extrinsic, then Rule 404(b) prohibits its admission unless the evidence is offered for some purpose other than proving the defendant's character "to show that on a particular occasion [he] acted in accordance with th[at] character." Fed. R. Evid. 404(b)(1).

In *Ford*, we held that evidence of uncharged tax returns that were "inextricably intertwined with the scheme charged in the indictment" was admissible as intrinsic evidence "outside the scope of Rule 404(b)." 784 F.3d at 1394. In *Ford*, the defendant was prosecuted for filing fraudulent tax returns using personal identifying information that she acquired under false pretenses, and the district court admitted the testimony of victims of "uncharged, but substantially

18

similar, conduct." *Id.* at 1390. And we affirmed that ruling, reasoning that "evidence of uncharged conduct that is part of the same scheme or series of transactions and uses the same *modus operandi* as the charged offenses is admissible as intrinsic evidence." *Id.* at 1394. We explained that the testimony concerned returns that were "filed by [the defendant], during the same time period, and using the same methods." *Id.* And we underscored that, like the returns charged in the indictment, many of the relevant uncharged returns contained false Schedule C information, used the same common addresses, claimed the same common false dependents, or involved homeless victims. *Id.*

The uncharged conduct in this appeal is similarly "inextricably intertwined" with the charged scheme. *Id.* The government charged Shabazz with conspiracy to defraud the United States by using the personal identifying information of Indigent Inmate applicants to submit fraudulent tax returns. And as in *Ford*, the uncharged returns were substantially similar to the charged returns. They were all filed in the names and with the social security numbers of prisoners who had applied to Indigent Inmate. They all claimed refunds for the same time period. They all listed one of fifteen common addresses. And they had other similar features, such as Schedule C forms that claimed large car and truck expenses and false W-2s that listed Revco or CVS, which acquired Revco, as the employer. We disagree with

19

Shabazz that the charged and uncharged returns shared only "traits inherent in all inmate tax fraud schemes."

Shabazz misunderstands our precedent when he contends that the evidence was inadmissible because it "was not necessary to prove the conspiracy charged in Count 1" or otherwise "required" to explain the conspiracy. Our precedent does not demand that intrinsic evidence establish an element of a charged offense. It is enough that the uncharged evidence was an "integral and natural part of [the] account" of the tax-fraud conspiracy. *United States v. Troya*, 733 F.3d 1125, 1131 (11th Cir. 2013) (quoting *United States v. Edouard*, 485 F.3d 1324, 1344 (11th Cir. 2007)).

Shabazz also argues that the evidence should have been excluded under Rule 403 because it was substantially more prejudicial than probative, but we disagree. In similar cases, we have "refused to find" that "other acts evidence inextricably intertwined with the crimes charged . . . should nonetheless be excluded as unduly prejudicial." *United States v. U.S. Infrastructure, Inc.*, 576 F.3d 1195, 1211 (11th Cir. 2009) (collecting cases). And we will not do so here. The evidence of uncharged conduct was highly probative of the existence of a conspiracy, and we cannot say that it was "dragged in by the heels solely for prejudicial impact." *United States v. Wilson*, 788 F.3d 1298, 1314 (11th Cir. 2015) (citation and internal quotation marks omitted). The district court did not abuse its discretion.

20

2.  The Photographs of Shabazz and Leslie Shabazz with Large Sums of Money

Shabazz argues that the photographs of him and Leslie Shabazz with large stacks of currency were irrelevant because the government failed to introduce evidence of the origin of the funds or the time, place, or context of the photographs, but we disagree. We have held that "[t]he government [i]s entitled to show that [a defendant] . . . experienced a sudden acquisition of large sums of money from unexplained sources in order to prove that he . . . received substantial income and resources from the continuing criminal enterprise with which he was charged." *Gonzalez*, 940 F.2d at 1423. The government is not even required to "trace the source of . . . new wealth" if "the charged crime involves pecuniary gain and the [g]overnment presents other evidence of the defendant's guilt." *United States v. Lattimore*, 902 F.2d 902, 903 (11th Cir. 1990). Shabazz had a host of financial obligations, including the support of multiple wives and 22 children, and he argued that he satisfied those obligations by running a music-promotion business, raising chickens and selling eggs, and running a car-detail business. The large sums of money depicted in the photographs were suspicious in the light of those financial circumstances and "properly admissible as circumstantial evidence of [Shabazz's] involvement in a crime involving pecuniary gain." *Id.* at 903.

Shabazz also alludes to the possibility that the photographs were unduly prejudicial, but if there was a risk of unfair prejudice, it did not substantially

21

outweigh the probative value of the photographs. *See United States v. Williams*, 865 F.3d 1328, 1341 (11th Cir. 2017) ("Federal Rule of Evidence 403 requires a showing that the prejudicial effect of relevant evidence *substantially* outweighs its probative value."). The district court did not abuse its discretion.

### C. The District Court Did Not Violate Shabazz's Right Not To Wear Jail Clothes.

Shabazz argues that the district court violated his right not to wear jail clothes on the second day of trial. As a threshold matter, we acknowledge a citation error in our case law. We stated in *United States v. Graham* that "[i]t is a Fourteenth Amendment violation to compel an accused to stand trial before a jury while dressed in identifiable prison clothes." 643 F.3d 885, 895 (11th Cir. 2011) (citation and internal quotation marks omitted). That statement would have been true had *Graham* involved a state trial because the Fourteenth Amendment forbids state deprivations of federal civil rights. To be sure, both the Fourteenth Amendment and the Fifth Amendment provide that no person shall be deprived "of life, liberty, or property, without due process of law," U.S. Const. amends. V, XIV, but only the Fifth Amendment protects the accused in a federal trial. The doctrine is the same under the Fifth Amendment, and our decision in *Graham* makes clear that when, as here, the defendant waives his right to appear in street clothes, he may not later complain about the consequences of his decision.

22

In *Graham*, we held that a defendant may not "create[] his own problem" by wearing jail clothes for "strategic advantage" and then seek reversal because he chose to wear those clothes. 643 F.3d at 895, 896. The defendant in *Graham* had previously told the district court that he would obtain street clothes to wear during the trial. *Id.* at 895. But on the day of trial, "he had no street clothes, no explanation for why he lacked them, and no proposal for a way to get any without delaying the trial." *Id.* His counsel also sought to use his attire for strategic advantage. *Id.* at 892, 896. His counsel explained in his opening statement that the defendant "want[ed] everybody to know" that he was in jail, and the defendant testified that he was "wearing [jail clothes] because of the things that the [g]overnment ha[d] done to [him.]" *Id.* at 896. We rejected the defendant's argument that the district court erred by refusing to allow him to change. *Id.* at 895. We held that the defendant "created his own problem" and that "the district court properly refused to delay the trial." *Id.*

In a similar vein, Shabazz waived his Fifth Amendment right when he rejected the "strong suggestion" of the district court to change into street clothes. As in *Graham*, Shabazz voluntarily sought to use his attire for strategic advantage so that the jury would not get "the wrong impression" and forget that he was a prisoner. Indeed, unlike the defendant in *Graham*, Shabazz *explicitly* waived his right when he declined the opportunity to change. The district court went out of its

23

way to explain that "criminal defendants are not required to wear prison garb during trials, and it is because, for some people, that will create a presumption of guilt." It stated that he "may be frustrated with the system, and frustrated with perceived injustices, but . . . [he] shouldn't let that spill over into [his] choice of clothes to wear before th[e] jury." Although it acknowledged that it could not "make [him]" change, it urged him to "do the smart thing and put [his] suit back on." And it explained that it did not "mind taking the time [to allow him] to put [his] suit on." But Shabazz refused the invitation and waited until the jury entered the room to object. As in *Graham*, the district court "properly refused to delay the trial" because Shabazz "appeared in jail clothes before the jury as a result of his own conduct." *Id.*

We also reject Shabazz's argument that the limiting instruction issued by the district court "compounded the problem by calling undue attention to the inappropriate clothing and placing the blame for such attire solely upon [Shabazz]." Shabazz never objected to that instruction, and we must presume that the jury followed the instruction not to hold Shabazz's attire against him. *See United States v. Almanzar*, 634 F.3d 1214, 1223 (11th Cir. 2011).

### D. The District Court Did Not Err when It Gave the Jury a Pinkerton Instruction.

Shabazz argues that the district court erred when it instructed the jury about conspirator liability because there was insufficient evidence that Shabazz joined a

24

conspiracy and because the particular wording of the instruction did not appropriately guide the jury in its deliberations. Under the rule enunciated in *Pinkerton*, "[e]ach party to a continuing conspiracy may be vicariously liable for substantive criminal offenses committed by a co-conspirator during the course and in the furtherance of the conspiracy, notwithstanding the party's non-participation in the offenses or lack of knowledge thereof." *United States v. Silvestri*, 409 F.3d 1311, 1335 (11th Cir. 2005) (emphasis omitted) (quoting *United States v. Mothersill*, 87 F.3d 1214, 1218 (11th Cir. 1996)). The substantive offenses must only be a "reasonably foreseeable consequence of the conspiracy." *Id.* at 1336 (quoting *Mothersill*, 87 F.3d at 1218). It follows that a district court does not err in giving a *Pinkerton* instruction if "the evidence was sufficient for a reasonable jury to have concluded, beyond a reasonable doubt, that the [substantive counts were] reasonably foreseeable consequence[s] of the . . . conspiracy alleged in the indictment." *United States v. Alvarez*, 755 F.2d 830, 848 (11th Cir. 1985). "[W]e must view the evidence in the light most favorable to the government and accept all reasonable inferences and credibility choices made by the jury." *Id.* (internal citation omitted).

Ample evidence supported the conclusion that Shabazz joined a conspiracy to defraud the United States, 18 U.S.C. § 371, and that the offenses charged in the substantive counts were reasonably foreseeable consequences of that conspiracy.

25

To establish a conspiracy, "the government must prove beyond a reasonable doubt (1) that the conspiracy existed; (2) that the defendant knew of it; and (3) that the defendant, with knowledge, voluntarily joined it." *United States v. Nerey*, 877 F.3d 956, 968 (11th Cir. 2017) (quoting *United States v. Vernon*, 723 F.3d 1234, 1273 (11th Cir. 2013)). "The existence of an agreement may be proven by circumstantial evidence, including 'inferences from the conduct of the alleged participants or from circumstantial evidence of a scheme.'" *Silvestri*, 409 F.3d at 1328 (quoting *United States v. Tamargo*, 672 F.2d 887, 889 (11th Cir. 1982)). Shabazz does not deny the existence of a conspiracy to defraud the United States. He instead argues that he "was a figurehead for the Indigent Inmate charity, which someone used in furtherance of a tax fraud scheme." But the evidence established that Shabazz founded and financed Indigent Inmate, that Shabazz personally rented several of the addresses used in the scheme and installed other individuals to live at some of the addresses, and that at least two bank cards in prisoners' names were found in Shabazz's wallets. Shabazz also testified and denied that he knew of or joined a conspiracy, and "a statement by a defendant, if disbelieved by the jury, may be considered as *substantive evidence* of the defendant's guilt," particularly when the "elements to be proved for a conviction include highly subjective elements [like] the defendant's intent or knowledge." *United States v. Brown*, 53 F.3d 312, 314, 315 (11th Cir. 1995). "Having seen and heard" Shabazz's testimony, "the jury was

26

free to discredit h[is] explanation, to infer that the opposite of what []he said was true, and to consider that inference as substantive evidence of h[is] guilt." *United States v. Hough*, 803 F.3d 1181, 1188 (11th Cir. 2015).

The substantive counts were also reasonably foreseeable consequences of the conspiracy. For example, a conspiracy to defraud the government by submitting fraudulent tax returns may naturally involve wire fraud due to the submission of the returns. We reject Shabazz's argument that the *Pinkerton* instruction prompted the jury "to extrapolate backwards and find Shabazz guilty of the conspiracy charge" based on evidence of a series of unrelated criminal acts.

Shabazz also contends that the instruction "relieved the government of its burden of proof" because it "t[old] the jury to consider merely what was reasonably foreseeable to Shabazz" without "direct[ing] the jury to determine *when* he obtained the requisite knowledge." We have explained that a district court "is given wide discretion as to the style and wording employed in [a jury] instruction" as long as the "instruction[] accurately reflect[s] the law." *United States v. Verbitskaya*, 406 F.3d 1324, 1330–31 (11th Cir. 2005). We must consider the jury charge as a whole, and we may reverse "only if we are left with a substantial and ineradicable doubt as to whether the jury was properly guided in its deliberations." *Id.* at 1331 (quoting *United States v. Fulford*, 267 F.3d 1241, 1245 (11th Cir. 2001)).

27

The district court accurately stated the law and "properly guided" the jury in its deliberations when it repeated, almost verbatim, the pattern instruction. *See* Pattern Crim. Jury Instr. OI O13.5 (2016). The instruction did not suggest that Shabazz could be held liable for crimes that occurred before he joined the conspiracy because the district court stated that the defendant must have been a member of the conspiracy "when the [substantive] crime[s] w[ere] committed." Shabazz also misunderstands our precedent when he argues that the district court should have clarified that Shabazz had to have "advance knowledge . . . that others were using information from Indigent Inmate to commit the substantive offenses." *Pinkerton* liability attaches "*notwithstanding* [*a defendant's*] *non-participation in the offense or lack of knowledge thereof*" if the substantive offenses were a "reasonably foreseeable consequence of the conspiracy." *Silvestri*, 409 F.3d at 1335–36 (citations and internal quotation marks omitted). Finally, the instruction was clear that the jury had to find the elements of *Pinkerton* liability "beyond a reasonable doubt," so the district court did not impermissibly shift the burden of proof.

### E.  Sufficient Evidence Supports Shabazz's Convictions.

Shabazz argues that there was insufficient evidence to support his convictions because the government failed to prove that he joined a conspiracy and that the "non-testifying inmates named in the respective aggravated identity theft

28

counts[] were real people who did not authorize use of their identifiers." We review the sufficiency of the evidence *de novo*, "view[ing] the evidence and all reasonable inferences derived therefrom in the light most favorable to the government." *Nerey*, 877 F.3d at 967. The "[e]vidence will be deemed sufficient to sustain a conviction unless 'no rational trier of fact could have found proof of guilt beyond a reasonable doubt.'" *Id.* (quoting *United States v. Diaz*, 248 F.3d 1065, 1093 (11th Cir. 2001)).

We have already explained that ample evidence supports the conspiracy conviction. We underscore only that Shabazz's insistence that the case against him was not as strong as it possibly could have been is irrelevant. Our precedent makes clear that "[i]t is *not* necessary for the government's evidence to be inconsistent with *every* reasonable hypothesis except that of guilt in order to be sufficient." *Silvestri*, 409 F.3d at 1328.

We also reject Shabazz's argument that the government failed to prove that he committed aggravated identity theft because the government offered no evidence that he "knew that the means of identification he used belonged to" "real people who did not authorize use of their identifiers." To be sure, the statute requires the government to prove that the defendant "knew that the identity [used in the scheme] belonged to a real person." *United States v. Gomez-Castro*, 605 F.3d 1245, 1248 (11th Cir. 2010) (discussing 18 U.S.C. § 1028A(a)(1)). But the

29

government may "rely on circumstantial evidence about an offender's misuse of a victim's identity to prove the offender knew the identity belonged to a real person." *Id.* at 1249. The government introduced the Indigent Inmate application for each of the inmates as well as the fraudulent tax return that was filed for each inmate. And the rest of the evidence, viewed in the light most favorable to the government, established that Shabazz opened a sham charity for prisoners to collect the personal identifying information of real inmates to use for fraudulent purposes. The jury was entitled to draw the reasonable inference that Shabazz knew that he was using information that belonged to real people. Indeed, when he testified, Shabazz denied that he filed the fraudulent returns, but admitted that the returns used the personal identifying information found in the Indigent Inmate applications of real people. He stated, "[S]omebody got ahold of them folks's information and, you know, somebody start[ed] filing taxes on a lot of them." Sufficient evidence supports Shabazz's convictions.

### F.  The District Court Did Not Err when It Calculated Shabazz's Sentencing Guidelines Range, Nor Did It Impose a Substantively Unreasonable Sentence.

Shabazz argues that the district court erred when it imposed a role enhancement and considered uncharged conduct when calculating the loss amount, and he argues that the district court imposed a substantively unreasonable sentence because his crimes were not particularly malicious and the sentence he received

30

was greater than average fraud and theft sentences. We review *de novo* the interpretation of the Guidelines by the district court and the application of the Guidelines to the facts. *United States v. Cubero*, 754 F.3d 888, 892 (11th Cir. 2014). We review for clear error the factual findings of the district court, including its role-enhancement and loss-amount determinations. *Id.*; *United States v. Caraballo*, 595 F.3d 1214, 1231 (11th Cir. 2010) (role-enhancement determinations); *Ford*, 784 F.3d at 1396 (loss-amount determinations). And we review the substantive reasonableness of a sentence for abuse of discretion. *See Cubero*, 754 F.3d at 898.

### 1.  The Four-Level Role Enhancement

Shabazz argues that the district court clearly erred when it applied a four-level enhancement for his role as a leader of the conspiracy. Under section 3B1.1, "[t]he government bears the burden of proving by a preponderance of the evidence that the defendant had an aggravating role in the offense." *United States v. Yeager*, 331 F.3d 1216, 1226 (11th Cir. 2003). A district court may increase a defendant's offense level by four levels "if the defendant 'was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive.'" *Id.* (quoting U.S.S.G. § 3B1.1(a)). But the defendant need only have been "the organizer, leader, manager, or supervisor of one or more other

31

participants." U.S.S.G § 3B1.1 cmt. n.2. We determine whether a defendant was an

organizer or leader by considering the following several factors:

> (1) the exercise of decision making authority, (2) the nature of
> participation in the commission of the offense, (3) the recruitment of
> accomplices, (4) the claimed right to a larger share of the fruits of the
> crime, (5) the degree of participation in planning or organizing the
> offense, (6) the nature and scope of the illegal activity, and (7) the
> degree of control and authority exercised over others.

*Caraballo*, 595 F.3d at 1231 (quoting *United States v. Gupta*, 463 F.3d 1182, 1198

(11th Cir. 2006)). "In many of the cases where we have affirmed a finding that a

defendant played a leadership or organizational role under [section] 3B1.1(a), there

was evidence that the defendant had recruited participants, had instructed

participants, or had wielded decision-making authority." *Id.* (collecting cases).

Substantial evidence established that Shabazz managed the Indigent Inmate

scheme. His employees testified that Shabazz founded Indigent Inmate, financed

its operations, and hired and managed the employees. Indeed, Sheena Shabazz,

who managed the day-to-day operations, and Leslie Shabazz reported to him. And

the evidence established that Shabazz directed Leshun Boyd-Gordon, a client of

Shabazz's music-promotion business, to live at one of the common addresses listed

on a number of fraudulent tax returns, including the William Malone return.

The district court was also entitled to find that the scheme involved at least

five participants. In addition to Sheena Shabazz, Leslie Shabazz, and Boyd-

Gordon, both Shabazz's sister, Camille Moore, and his cousin, Nathan Moore,

32

participated in the scheme. Both worked at another of Shabazz's businesses, and both rented or occupied residences that multiple Indigent Inmate tax returns listed as a taxpayer address. And Shabazz confessed to the investigating agents that Dion McBride was involved and that "there were other people involved in the Pittsburgh area." The district court did not clearly err.

Finally, Shabazz unpersuasively argues that the district court impermissibly shifted the burden of proof so that Shabazz was forced to disprove that he had an aggravating role in the scheme. In support, he cherry picks a stray comment by the district court that it "can't say that he did not exercise control over" the individuals involved in the conspiracy. But the context of that statement makes clear that the district court correctly applied the law to the facts. In response to defense counsel's argument that Shabazz did not "exercise control over any of the[] individuals [involved in the scheme] and that that is what is required," the district court stated,

> I don't agree with that. I can't say that he did not exercise control over them. I don't think that's true. I think he did. I think he does satisfy the enhancement's definition or description of one as an organizer or leader of criminal activity, so I am going to add 4 levels . . . .

The district court plainly found that "he d[id] satisfy the enhancement's definition or description."

## 2.  The Intended Loss Amount

Shabazz also argues that the district court clearly erred when it calculated the intended loss amount. The district court estimated the loss amount by

33

considering all tax returns that were filed in the names of Indigent Inmate applicants and listed one of fifteen common addresses as the taxpayer address—regardless of whether those addresses were directly or indirectly linked to Shabazz. Shabazz concedes that he may be held accountable for the returns that included the addresses of the four properties he personally leased, but he maintains that it was clear error to consider the returns that included the addresses for the other eleven properties because the government failed to establish by a preponderance of the evidence using "reliable and specific evidence" that the addresses were "connect[ed] to him" or "within the scope of any agreement with others." We disagree.

In *Ford*, we held that the district court did not clearly err when it calculated the loss amount for a tax-fraud scheme based on the losses from returns that used one of several common addresses. 784 F.3d at 1396–97. We explained that the district court reviewed summary charts prepared by the Internal Revenue Service and that the investigating agent "interviewed as many victims as he could locate and visited each address and confirmed that it was highly unlikely that these addresses housed the individuals who were identified as residing there." *Id.* at 1396. We determined that, "[h]aving heard this testimony and the trial testimony, and having reviewed the evidence, the district court reasonably concluded that the

34

government had proven by a preponderance of the evidence that the 'common address' returns were fraudulent." *Id.* at 1397.

The district court was entitled to rely on the same methodology here. The evidence at trial established that Shabazz founded and financed Indigent Inmate. The district court considered only those tax returns that were filed in the names of Indigent Inmate applicants and listed one of fifteen common addresses as the taxpayer address. And eleven of the fifteen addresses were either directly or indirectly linked to Shabazz. For example, Nathan Moore, Shabazz's cousin and employee, owned 1394 Metropolitan Parkway, and Shabazz listed that address as his present address and Moore as the owner of that residence in his rental application for 2945 Orr Drive. And Shabazz permitted his client, Boyd-Gordon, to reside and then take over the lease at one of his properties, and Boyd-Gordon listed Shabazz as an additional occupant when he applied to rent 2007 Sharp Street. Although investigators did not discover a similarly clear link between Shabazz and the remaining four addresses, it was reasonable for the district court to consider the returns that listed those addresses in the light of the significant evidence at trial that linked information from Indigent Inmate applications to fraudulent tax returns that listed a common address that was under Shabazz's control. Even if Shabazz was not personally involved in collecting the fraudulent refunds mailed to those addresses, there was sufficient evidence to conclude that the properties at those

35

addresses were used in the criminal conspiracy. And if a defendant is involved in "jointly undertaken criminal activity," then "all acts and omissions . . . reasonably foreseeable in connection with that criminal activity" are relevant. U.S.S.G. § 1B1.3(a)(1)(B); *see United States v. Rodriguez*, 751 F.3d 1244, 1256 (11th Cir. 2014).

Shabazz responds that *Ford* is inapposite because, unlike the defendant in *Ford*, he did not file the returns himself and the methodology resulted in a far higher loss amount here than the loss amount in *Ford*, but we are unpersuaded. Although Shabazz may not have filed the returns himself, he was similarly connected to the fraudulent returns through Indigent Inmate. And no part of the reasoning in *Ford* turned on the magnitude of the resulting loss amount. The district court did not clearly err.

3.  The Substantive Reasonableness of the Sentence

Shabazz argues that his sentence is substantively unreasonable for a variety of reasons that minimize the seriousness of his offenses, belittle the victims of his crimes, and draw irrelevant comparisons between his sentence and average fraud and theft sentences nationwide. We review for abuse of discretion whether a sentence is substantively unreasonable by considering "the totality of the circumstances" under the statutory sentencing factors, 18 U.S.C. § 3553(a). *Cubero*, 754 F.3d at 892. We have underscored that we must give "due deference"

36

to the district court because it has an "institutional advantage" in making sentencing determinations. *Id.* (quoting *United States v. Shaw*, 560 F.3d 1230, 1238 (11th Cir. 2009)). "We may vacate a sentence only if we are left with the definite and firm conviction that the district court committed a clear error of judgment in weighing the [section] 3553(a) factors by arriving at a sentence that lies outside the range of reasonable sentences dictated by the facts of the case." *Id.* at 892–93 (citation and internal quotation marks omitted). "We ordinarily expect a sentence within the Guidelines range to be reasonable." *United States v. Gonzalez*, 550 F.3d 1319, 1324 (11th Cir. 2008). And the party challenging the sentence bears the burden to show that it is "unreasonable in light of the record and the [section] 3553(a) factors." *Id.*

Shabazz's sentence is reasonable. His sentence of 277 months of imprisonment was below the low end of the Guidelines range, which was 292 to 365 months, and the district court correctly considered the relevant sentencing factors. It stated that it had "carefully considered all of the sentencing factors set forth in . . . [s]ection 3553(a)," although it acknowledged that it placed particular weight on "the nature and circumstances of the offense and the history, characteristics [sic] of the defendant." That factor "predominated . . . probably over any one particular factor," though "not over all six of the others." We have held that "[a]n acknowledgment [that] the district court has considered the defendant's

37

arguments and the [section] 3553(a) factors will suffice." *Id.* And though Shabazz maintains that the statements the district court made about the seriousness and mercilessness of his crimes were "over-kill," we have held that a district court may attach "great weight" to one factor, *Cubero*, 754 F.3d at 892 (quoting *Shaw*, 560 F.3d at 1237), including "the nature and circumstances of the offense," 18 U.S.C. § 3553(a)(1). The district court did not abuse its discretion.

### III. CONCLUSION

We **AFFIRM** Shabazz's convictions and sentence.