[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 18-12258
Non-Argument Calendar

_____

D.C. Docket No. 5:17-cr-00017-RH-1

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

ARKELIUS CANTRELL GRAY,

Defendant - Appellant.

_____

Appeal from the United States District Court
for the Northern District of Florida

_____

(June 7, 2019)

Before TJOFLAT, WILLIAM PRYOR, and GRANT, Circuit Judges.

PER CURIAM:

Arkelius Cantrell Gray was convicted by a jury on two counts of drug and firearm offenses.  *See* 18 U.S.C. §§ 922(g)(1), 924(a)(2); 21 U.S.C. §§ 841(a)(1), (b)(1)(B)(viii), (b)(1)(D).

Before trial, Gray filed a motion to suppress incriminating statements that he made to Florida Highway Patrolman Jonathan Gentry (the "Primary Officer").

The Primary Officer lawfully pulled over a car that Gray occupied along with his girlfriend (the "Girlfriend") and another occupant.  After effecting the stop, the Primary Officer smelled marijuana as he interacted with the car's occupants.  He then lawfully handcuffed Gray and the other occupant and lawfully searched the car's trunk.  Before conducting the search, however, the Primary Officer called for backup and waited until that backup, Deputy Sheriff Wade Boan (the "Secondary Officer"), reported to the scene.

During the search, the Primary Officer recovered from the car's trunk three items—marijuana, pills, and a firearm—and placed those items—one at a time—on the car's roof.  Gray then made various incriminating statements in two separate intervals, which we refer to as the first set of statements and the second set of statements.

The District Court conducted a pre-trial suppression hearing.  Gray contended that both sets of statements were elicited through questioning and that

2

he was never read his *Miranda* rights.[1]  The Government conceded that the Primary Officer eventually questioned Gray.  It asserted, however, that (1) only the second set of statements was the product of questioning and (2) those statements were made only after the Primary Officer had read Gray his *Miranda* rights.  At the hearing, the Court received testimonial evidence from various persons, including the Primary Officer and the Secondary Officer.  It also received documentary evidence in the form of the officers' police reports and of dashboard-camera footage from the Primary Officer's patrol car.  The Court denied Gray's motion to suppress.

After the trial, Gray renewed his motion to suppress, based largely on inconsistencies between the Secondary Officer's testimony at the suppression hearing and his testimony at trial.  The District Court denied that motion, too.

We affirm the District Court's denial of Gray's renewed motion to suppress because the Court's factual findings, which are the only issues in dispute, were not clearly erroneous.  Because we write for the parties, we set out facts only as they are needed to support our analysis.

I.

A.

---

[1] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602 (1966).

The Fifth Amendment guarantees that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V.[2] In *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602 (1966), the Supreme Court held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Id.* at 444, 86 S. Ct. at 1612. These safeguards normally require that "[p]rior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Id.* These rights are known as "*Miranda* rights," and a person to whom the rights are read is said to be "*Mirandized*." The Government bears the burden of proving compliance with *Miranda* by a preponderance of the evidence. *Lego v. Twomey*, 404 U.S. 477, 486, 92 S. Ct. 619, 625 (1972).

B.

A motion to suppress evidence obtained in violation of *Miranda* involves questions of both law and fact, *United States v. Shabazz*, 887 F.3d 1204, 1213 (11th Cir. 2018), but the issues here—when Gray was questioned and whether he

---

[2] The right against self-incrimination applies to the States through the Fourteenth Amendment. *Malloy v. Hogan*, 378 U.S. 1, 3, 84 S. Ct. 1489, 1491 (1964).

was *Mirandized*—are purely factual.  We review a district court's factual findings for clear error.  *Id.*  In so doing, we "construe all facts 'in the light most favorable to the party prevailing below,' which, in this appeal, is the government."  *Id.* (quoting *United States v. Johnson*, 777 F.3d 1270, 1274 (11th Cir. 2015)).  To reverse, we must be left with the "definite and firm conviction that a mistake has been committed."  *United States v. Thomas*, 818 F.3d 1230, 1239 (11th Cir. 2016) (quoting *United States v. Rothenberg*, 610 F.3d 621, 624 (11th Cir. 2010)).  "Our review is not moored to the evidence presented at the suppression hearing; we are free to look at the whole record."  *United States v. Campbell*, 912 F.3d 1340, 1349 (11th Cir. 2019).

## II.

*Miranda* demands not the suppression of all incriminating statements, only those that were made by a person in "custody" in response to "express questioning or its functional equivalent."  *See Rhode Island v. Innis*, 446 U.S. 291, 300–01, 100 S. Ct. 1682, 1689 (1980).  The Government concedes that Gray, who was handcuffed on the side of the road when both sets of statements were made, was in custody.

As explained, this appeal entails two sets of statements, those made before Gray was allegedly *Mirandized* and those made after.  We review each set of statements in turn.

5

A.

When the Primary Officer removed the marijuana, pills, and firearm from the car's trunk, he placed those items on the car's roof. Gray asserted ownership of each item after it was placed on the roof.

Under *Miranda*, "[v]olunteered statements of any kind are not barred by the Fifth Amendment." *Id.* at 300, 100 S. Ct. at 1689 (quoting *Miranda*, 384 U.S. at 478, 86 S. Ct. at 1630).

The only issue on appeal regarding the first set of statements is whether the Primary Officer asked Gray any questions to elicit his assertions of ownership.[3]

We find no clear error with the District Court's finding that the first set of statements was not the product of questioning. The Primary Officer testified at the suppression hearing and at trial that he did not ask Gray any questions when he placed the items on the car's roof. The Secondary Officer testified that neither the Primary Officer nor he asked Gray any questions before Gray claimed the three items as his. The record contains a single piece of contrary evidence that the

---

[3] Gray offers a half-hearted argument that the Primary Officer elicited Gray's statements through non-verbal interrogation. *See, e.g.*, *Innis*, 446 U.S. at 301, 100 S. Ct. at 1689–90 ("[T]he term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." (footnotes omitted)). But the only fact that he marshals in support of that argument— that the Primary Officer placed the items on the car's roof—does not amount to interrogation. *See United States v. Glen-Archila*, 677 F.2d 809, 815 (11th Cir. 1982) (holding that a defendant was not subjected to *Miranda* interrogation when, among other things, law-enforcement officers told him they knew that drugs were on board his ship).

Primary Officer questioned Gray during this sequence of events.  At trial, defense counsel asked the Girlfriend about the marijuana.  Immediately after the Girlfriend testified that Gray claimed ownership of the marijuana, the following exchange took place between her and defense counsel:

> Q: When the defendant stated, "That's mine," was that in response to a question the officer asked?
>
> A: No, he didn't ask a question—oh, yeah, he did.  He asked who it belonged to.

This mid-sentence about-face was the only evidence presented either at the suppression hearing or at trial that the Primary Officer questioned Gray as he placed the three items on the car's roof.

The District Court did not commit clear error when it credited the Primary Officer's and the Secondary Officer's unequivocal testimony over the Girlfriend's wavering testimony.  *Cf. Shabazz*, 887 F.3d at 1215 ("We accord great deference to a district court's credibility determinations." (alteration omitted) (quoting *United States v. Gregg*, 179 F.3d 1312, 1316 (11th Cir. 1999))).

We now address the second set of statements, which turns out to be a thornier issue.

### B.

After Gray asserted ownership over the three items, he made further incriminating statements.  He (again) asserted ownership of the marijuana, pills

7

(which he stated were ecstasy), and firearm; he estimated the weight of the marijuana and the pill count of the ecstasy; he stated that the firearm was for self-defense; and he indicated that he had recently been released from prison.

The Government concedes that the Primary Officer questioned Gray to elicit this second set of statements but insists that Gray was *Mirandized* before any questions were asked. Gray disputes that he was ever *Mirandized*.

We summarize the evidence presented at the suppression hearing and at trial. We then analyze whether, considering this evidence, the District Court's factual finding that Gray had been *Mirandized* was clearly erroneous.

1.

The Primary Officer testified at both the suppression hearing and at trial that he *Mirandized* Gray before questioning him. The Primary Officer's written arrest reports memorialize the same. If that were it, affirming the District Court's factual findings would be a cakewalk. After all, we do not ordinarily disturb a court's resolution of a he said, she said. *See id.* ("[W]here 'the officers' testimonies are in direct conflict with the defendant's testimony, . . . a "trial judge's choice of whom to believe is conclusive on the appellate court unless the judge credits exceedingly improbable testimony."'" (alterations omitted) (quoting *United States v. Ramirez-Chilel*, 289 F.3d 744, 749 (11th Cir. 2002))). But as described below, the record

8

contains other evidence, evidence that renders the Primary Officer's testimony suspicious.

First, evidence pulled from the Primary Officer's dashboard camera and on-body microphone cast doubt on his testimony. When an officer activates his patrol car's cruiser lights, two things immediately happen. First, the dashboard camera begins recording video. And second, the officer's microphone, attached to his tactical vest, begins recording audio. Or so it should. Here, the dashboard camera did not capture the moment when the Primary Officer supposedly *Mirandized* Gray. We see the Primary Officer approach a man on the boundary of the screen and reach near his right chest pocket as he does so. The Primary Officer then directs the man completely off screen. The Primary Officer reemerges onto the screen about thirty seconds later with an item in his hand. Finally, about fifteen seconds later, he places a card into his right chest pocket. The viewer, curious as to what transpired off screen, might turn to the captured audio to listen to what was said. But the viewer would be sorely disappointed: The microphone malfunctioned, with no indication in the record as to why.

Second, the Secondary Officer offered inconsistent testimony on whether Gray had been *Mirandized*. At the suppression hearing, the Secondary Officer testified that he heard the Primary Officer *Mirandize* Gray. This testimony was unequivocal:

9

Q: Now, I asked you this morning whether you observed any *Miranda* rights or you heard any *Miranda* rights being read.

A: Yes, sir.

Q: Were you in the vicinity at that point?

A: I remember him reading the rights. If my memory serves me correctly, I was searching the vehicle behind [the Primary Officer]. He had asked me—he had already found everything, everything was done. He said, "Just go behind me and make sure I didn't miss anything." I was in the backseat of the car looking through it. I remember hearing it, but I can't tell you specifically where I was standing or anything of that nature. I remember it, but just don't remember where I was.

At trial, however, the Secondary Officer told a wholly different story:

Q: [I]n terms of the search, did you also search the vehicle?

A: I did. After everything was conducted with [the Primary Officer], he asked me to research the vehicle. He said, "Just go back through it and make sure I didn't miss anything." And briefly I went back through the vehicle; yes, sir.

Q: And while you were in the vehicle, could you hear the conversation that [the Primary Officer] was having with the defendant at that time?

A: I did not; no sir. The traffic going by—that was spring break traffic on 231—and from where I was, the driver's side mainly was where I did most of the search, I couldn't hear.

These pieces of evidence cast doubt on the Primary Officer's testimony. We find it troubling that the Primary Officer ushered Gray off screen, where the dashboard camera would not capture their interaction. We find it troubling that the microphone—which presumably would have conclusively resolved the factual

10

question before us and which was in the Primary Officer's exclusive control—failed to function.  And we find it troubling that the Secondary Officer testified that he heard Gray be *Mirandized* only to later testify that he could not in fact hear anything because the traffic was so loud.

But as troubling as this evidence is, "troubling" is not the legal standard.  Rather, we review a district court's factual findings for clear error.  *Shabazz*, 887 F.3d at 1213.

2.

The District Court, after considering the entire record, reached a thoughtful conclusion that we cannot conclude was clearly erroneous.

The District Court chose to credit the Primary Officer's testimony over Gray's testimony and reconciled the Primary Officer's testimony with the video footage.  The Primary Officer testified during the suppression hearing that he keeps a card imprinted with the *Miranda* rights (a "*Miranda* card") in his right chest pocket.  Indeed, he pulled a *Miranda* card out of his pocket during the hearing.  The Court found that the Primary Officer *Mirandized* Gray during the thirty-second interval when the two were off camera.  The Court reasoned that thirty seconds is about the amount of time required to read a defendant his *Miranda* rights.  "[T]he most likely explanation for the scenes on the video," the Court found, was that the Primary Officer

11

took the *Miranda* card from his pocket . . ., read it to the defendant within the next 30 seconds, reached up to put it away . . . but did not get it into the pocket, carried the card as he walked over to look at or do something at the car, then turned toward the camera and put the card away . . . .

The Girlfriend's testimony further supports this finding. She testified at trial that she heard the Primary Officer say to Gray, "Because you don't want to shut your mouth, let me go ahead and read you your rights." The testimony allowed the Court to infer that because the Primary Officer said he would *Mirandize* Gray, he in fact did so.

The Secondary Officer's initial testimony is not necessary for us to affirm the District Court's finding that Gray was *Mirandized*. This is so because in a credibility face-off between the Primary Officer and Gray, the Court was free to select Gray as the winner without other corroborating evidence. *See id.* at 1216 ("The absence of corroborating evidence, standing alone, does not permit us to reverse the credibility determination by the finder of fact.").[4]

---

[4] Though the Secondary Officer's inconsistent testimony does not factor into our review, it is not for the reason the Government proffers. The District Court acknowledged the inconsistency in the Secondary Officer's testimony and chose to ignore all aspects of his testimony in making its finding. The Government asserts that whenever a district court discredits all inconsistent testimony, the testimony plays no role in our clear-error analysis. If only it were so clear cut.

The significance of "internally inconsistent or implausible" testimony, *see Anderson v. Bessemer City*, 470 U.S. 564, 575, 105 S. Ct. 1504, 1512 (1985), like the Secondary Officer's, turns on context. Sometimes, as is the case here, the inconsistency simply prevents any meaningful inference from being drawn from the testimony at all. The testimony disappears from the evidentiary picture entirely. Other times, however, the *fact* of inconsistency is itself evidence.

12

At the end of the day, the District Court determined that the Primary Officer was more credible than Gray and found, using the video footage and the Girlfriend's testimony, that Gray was *Mirandized* before he was questioned. Because the Court adopted a "permissible view[] of the evidence," its finding was not clearly erroneous.  *See Easley v. Cromartie*, 532 U.S. 234, 259, 121 S. Ct. 1452, 1471 (2001) (quoting *Anderson v. Bessemer City*, 470 U.S. 564, 574, 105 S. Ct. 1504, 1511 (1985)).

III.

For these reasons, the District Court's denial of Gray's renewed motion to suppress his statements is **AFFIRMED.**

**SO ORDERED.**

---

Say, for example, that Gray had presented evidence at his suppression hearing or at trial that the Primary Officer had directed the Secondary Officer to falsely testify that he heard the Primary Officer *Mirandize* Gray.  The fact that the Secondary Officer testified one way at the suppression hearing and another way at trial would bolster the evidence that the Primary Officer solicited the perjured testimony as a means of covering up the fact that he did not in fact *Mirandize* Gray.  In that evidentiary context, we could not ignore the Secondary Officer's inconsistent testimony simply because the District Court discredited all his testimony.  Rather, we would be forced to analyze whether the Court's finding was clearly erroneous *in light of the inconsistency*.

Here, Gray does not argue that we should draw any inference from the inconsistent testimony.  For this reason, the Secondary Officer's testimony does not factor into our clear-error analysis.