[DO NOT PUBLISH]


IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 18-10696
_____

D.C. Docket No. 0:17-cr-60181-WPD-1

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

versus

TERRENCE LEONARD MATHIS,

Defendant - Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(August 16, 2019)

Before TJOFLAT, MARTIN, and TRAXLER,[*] Circuit Judges.

TRAXLER, Circuit Judge:

Terrence Mathis was convicted by a jury of two counts of unlawful possession of ammunition by a felon. *See* 18 U.S.C. § 922(g)(1). The district court sentenced Mathis to a 120-month term of imprisonment on each count and ordered them to be served consecutively. Mathis appeals, challenging his convictions and sentence. For the reasons explained below, we affirm.

I.

The charges against Mathis stem from the shooting of Karl Wolfer. Wolfer lived with his wife Lisa in a condominium in Lighthouse Point, Florida, and operated a liquor store in Lauderdale Lakes, Florida. The store was open until 1:00 a.m. on weekdays and until 2:30 a.m. on Fridays and Saturdays.

On Thursday, July 6, 2017, Wolfer closed the liquor store shortly after 1:00 a.m. and drove to a 24-hour Walmart a couple of miles away from his home. Wolfer called Lisa shortly after 2:00 a.m. and told her he had stopped at Walmart to buy groceries and was on his way home. When Wolfer did not return home, Lisa tried unsuccessfully to reach him on his cell phone. Around 4 a.m., Lisa went out to the condominium parking lot and saw Wolfer's van. Wolfer was inside the

---

[*] Honorable William B. Traxler, Jr., United States Circuit Judge for the Fourth Circuit, sitting by designation.

van and the engine was running.  Lisa initially believed Wolfer was asleep; she began calling for help when she was unable to wake him.

When the police arrived on the scene, they determined that Wolfer had been shot and was dead.  Two spent 9-mm cartridge casings were found on the ground next to broken glass from the van's window.  The casings bore a headstamp indicating that they were manufactured by Starline Brass in Sedalia, Missouri.  The ammunition was relatively rare, as the detective on the scene of the shooting had not previously seen that headstamp in his 26-year career.

A resident of the condominium complex told the officers that she had been awake at around 2 a.m. and let her cat out.  At around 2:10 a.m., she heard two loud noises in quick succession.  She initially thought the first noise might have been a cherry bomb, but after the second one, she realized they were gunshots.

The city of Lighthouse Point has 44 license-plate recognition cameras "set up strategically throughout the city" in an effort to monitor "every entrance and exit into the city."  The cameras take pictures of license plates and the back of each passing vehicle, and the information captured by the system is fed into a searchable database.  Officers investigating Wolfer's death ran the plate number from Wolfer's van through the Lighthouse Point database to determine the route he took and whether he had been followed.  The officers also reviewed videos captured by security cameras at Wolfer's liquor store, a neighboring restaurant, and Walmart.

3

Video from the liquor store showed a man wearing a hooded Yankees sweatshirt get out of a Chevrolet Impala with a sunroof and spoiler, enter the store and make a purchase, and drive out of the parking lot at 12:50 a.m. The Impala returned to the parking lot just before 1 a.m. Wolfer left the store in his van at about 1:10 a.m., heading east on 19th Street. The Impala followed behind.

Video from Walmart showed Wolfer's van arriving at 1:44 a.m. The Impala entered the Walmart parking lot a minute later. Wolfer entered the store at 1:51 a.m. While Wolfer shopped, the Impala drove around the parking lot a bit and then settled into a space that had a line of sight to Wolfer's van. Wolfer returned to his van at 2:06 a.m. and left the parking lot; the Impala pulled out a minute later and proceeded in the same direction as Wolfer's van.

Wolfer's van was captured twice by the Lighthouse Point camera system. Both times, the Impala was seen following about 20 seconds behind the van. The system captured the Impala driving in a direction away from Wolfer's condominium at 2:17 a.m. The Impala license plate number had not been captured by the Lighthouse Point camera system in the previous 18 months. Neither the Lighthouse Point system nor the surveillance videos captured images of the driver of the Impala after it left the liquor store, and the investigating officers could not ascertain if there were any passengers in the car.

4

The license plate on the Impala was registered to Mathis at an address of 3030 N.W. 187th Street, Miami Gardens, Florida.  Law enforcement officials obtained a search warrant for Mathis's DNA and, on July 15, 2017, conducted a traffic stop of the Impala as it was being driven by Mathis.  The officers seized a cell phone from the car, as well as documents addressed to Mathis at the 187th Street address.  Mathis was taken to the Broward County Sheriff's office, where he was fingerprinted and a DNA sample was taken.

Law enforcement officials searched the 187th Street residence that same day.  During the search of Mathis's bedroom, they found a single, live round of 9mm ammunition.  The ammunition bore the same manufacturing marks as the spent casings found at the scene of the shooting.

Data retrieved from Mathis's cell phone showed that in the early morning hours after Wolfer's shooting, someone using the phone conducted multiple Internet searches looking for breaking local news about a shooting and for information about the cost of changing a license plate.   More Internet searches were conducted later that afternoon and in the following days, and the person using the phone accessed multiple stories about Wolfer's shooting.

Mathis's DNA was found on the intact ammunition recovered from his bedroom.  Forensic analysis indicated that the spent casings found at the scene of the shooting had been fired from the same gun.  The intact round and one of the

5

spent casings had identical marks on them, which indicated that they had at some point been placed in the same magazine or firearm.

Mathis was interviewed at the Sheriff's office after the July 15 traffic stop. Detective Ricky Libman advised Mathis of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966), and Mathis signed a form waiving his rights. During the interview, Mathis initially denied having been in the vicinity of Lighthouse Point on July 7. However, after being shown a surveillance picture of the man in the Yankees sweatshirt in Wolfer's liquor store, Mathis admitted that he was the person in the photograph and that he had driven his car to the liquor store. He explained that a pimp and a prostitute were in the car with him, and that he and the prostitute engaged in sexual activity after leaving the liquor store. He claimed that he dropped them off and then went home for the rest of the night. Mathis also told Libman that he had his cell phone with him that night.

Mathis was charged with two counts of possession of ammunition by a convicted felon. *See* 18 U.S.C. § 922(g)(1). Count one charged Mathis with possessing the ammunition found at the scene of Wolfer's shooting. Count two charged him with possessing the live round found in his bedroom. The jury convicted Mathis of both counts. The district court imposed consecutive sentences of 120 months' imprisonment on each count, for a total sentence of 240 months.

II.

Mathis first challenges the district court's denial of his motion to suppress statements he made during the July 15 interview at the Sheriff's office. In his suppression motion, Mathis argued that he repeatedly asked for an attorney during the interview, but the interviewing officers ignored his requests and continued to interrogate him. Because the interrogation did not cease after he requested an attorney, Mathis sought suppression of his statements and any physical evidence obtained as a result of those statements. The district court denied the motion, concluding that Mathis had not unambiguously invoked his right to counsel. Mathis appeals, arguing that he unambiguously requested counsel multiple times during the interview.

"A motion to suppress evidence presents a mixed question of law and fact. . . . [W]e review the district court's factual findings for clear error, and its application of the law to the facts *de novo*." *United States v. Lewis*, 674 F.3d 1298, 1302–03 (11th Cir. 2012) (internal quotation marks omitted).

A.

In order to protect the Fifth Amendment right against self-incrimination, the Supreme Court has held that the police must explain the contours of the Fifth Amendment rights and obtain a waiver of those rights before statements made during custodial interrogation can be admitted at trial. *See Miranda*, 384 U.S. at

7

444-45. If the suspect requests an attorney, the interrogation must cease until the suspect has had a chance to confer with counsel, unless the suspect himself initiates further communication with the police. *See Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981). The *Edwards* rule, however, applies only when the suspect clearly and unequivocally invokes the right to counsel; an ambiguous or equivocal request does not obligate the police to stop the interrogation. *See Davis v. United States*, 512 U.S. 452, 459 (1994).

There is no dispute that Mathis was subject to custodial interrogation and that he made multiple references to an attorney during the course of the interview. The only question on appeal is whether Mathis made any unambiguous requests for an attorney that were ignored by the interviewing officers.

## B.

The interview (which was recorded) took place on Saturday, July 15, at the Broward County Sheriff's West Park district office. Detective Ricky Libman conducted the bulk of the interview. Almost immediately after Libman entered the room, Mathis asked (twice) if he needed an attorney. Libman responded that he could not advise Mathis about what Mathis needed to do, and Libman continued to ask Mathis questions. Libman explained to Mathis that he had a warrant authorizing him to take his fingerprints and obtain a DNA sample and began explaining Mathis's rights under *Miranda.* After being advised of his right to

8

counsel, Mathis asked, "So I can get one now?"  Libman responded that he could,

but that the attorney would not "show up here."  Libman continued explaining

Mathis's rights to him, and Mathis ultimately signed a form waiving his rights.

About 90 minutes into the ensuing interrogation, Mathis said, "Listen, can I

ask you a question. . . .  All right, in all honesty, can I have . . . a lawyer before I do

DNA?"  Libman responded, "No.  Because the judge signed the order on the DNA.

It's done.  The lawyer . . . has nothing to do with DNA."

An hour later, after Mathis's fingerprints and DNA sample had been taken,

Detective Barbara Dyer entered the interview room and asked Mathis for his

consent to search his cell phone that had been seized from the car after the traffic

stop.  Mathis responded, "I think I should get a lawyer.  I mean, I, it's not that, you

know what I mean, like I've got something to hide.  But I'm just, I've been through

something already before this."  When Dyer responded that they would then keep

the phone while waiting for a search warrant, Mathis asked, "what if I give you all

the consent? . . . . I mean, you all gonna do it anyway, right?"  Dyer explained to

Mathis he could consent to the search and get the phone back that day, or they

would keep the phone while they sought a search warrant, which, as it was the

weekend, would likely take some time.  After Dyer tried to explain to Mathis that

they would be looking for data contained in the phone that would help "prove or

disprove who killed someone," and Mathis expressed his confusion, the following

discussion took place:

| | |
|---|---|
| Mathis: | I don't know what I'm supposed to do.  I think I should ask a lawyer first because I don't know what I should do.  Like, I really don't.  I'm . . . just being honest. |
| Dyer: | You don't have to sign the form.  Not a problem. |
| Mathis: | I mean, can I, can I like, get a lawyer now? |
| Dyer: | No.  Not this very second. . . .  We're not calling a lawyer and bringing you a lawyer.  So since you don't want to, and you're hesitant, that's fine.  And I understand your position.  I'm gonna go ahead . . . . |
| Mathis: | No, I'm not saying I don't want to.  I'm just saying like I'd rather like a lawyer here now like . . . . |
| Dyer: | We're not calling a lawyer here for you.  Plus it's Saturday.  It's Saturday.  So do you have a lawyer on retainer that you're just gonna call up and go, you know, I need somebody to sign up, even though, you know what I mean? |
| Mathis: | No, not really [unintelligible].  What I'm saying, all right, so, if I do it today you all give me my phone back today? |
| Dyer: | Yeah. |
| Mathis: | Oh, okay, I mean, no problem. |

After this conversation, Mathis signed a form consenting to a search of his

cell phone, and the questioning continued.  After taking several breaks, Detective

Libman re-entered the room and began confronting Mathis with information

obtained from his cell phone.  Libman told Mathis that he believed Mathis was

trying to protect his brother, and he urged Mathis to tell the truth.  Mathis then

10

said, "Yeah, I know, but, I need, I wanna get a lawyer first, before, you know,

cause . . . ." At that point, Libman stopped questioning Mathis and left the

interview room. Mathis was released later that day.

C.

Determining whether a defendant has "*actually invoked* his right to counsel .

. . . is an objective inquiry." *Davis*, 512 U.S. at 458-59.

> Invocation of the *Miranda* right to counsel requires, at a minimum,
> some statement that can reasonably be construed to be an expression
> of a desire for the assistance of an attorney. But if a suspect makes a
> reference to an attorney that is ambiguous or equivocal in that a
> reasonable officer in light of the circumstances would have
> understood only that the suspect *might* be invoking the right to
> counsel, our precedents do not require the cessation of questioning.

*Id.* at 459 (citation and internal quotation marks omitted). "Although a suspect

need not speak with the discrimination of an Oxford don, he must articulate his

desire to have counsel present sufficiently clearly that a reasonable police officer in

the circumstances would understand the statement to be a request for an attorney."

*Id.* (citation and internal quotation marks omitted). "If the statement fails to meet

the requisite level of clarity, *Edwards* does not require that the officers stop

questioning the suspect." *Id.*

While it is clear from the conversations quoted above that Mathis was

thinking about an attorney during the interview, we nonetheless agree with the

district court that only Mathis's last statement was an unambiguous invocation of

his right to counsel.  Mathis's early statements asking if he needed an attorney or if he could have an attorney before giving the DNA sample can reasonably be understood as requests for advice and information rather than clear requests for counsel.

Mathis's statements to Detective Dyer after she asked for his consent to search his cell phone come closer to requests for counsel, but they still are not unambiguous, unequivocal requests for an attorney.  *See Davis*, 512 U.S. at 459 ("[A] statement either is such an [unambiguous] assertion of the right to counsel or it is not." (internal quotation marks omitted)).  This court has previously held that a defendant unequivocally requested counsel when he said, "I think I should call my lawyer." *Cannady v. Dugger*, 931 F.2d 752, 755 (11th Cir. 1991).  While Mathis did use similar language, he used the language as part of longer statements that muddied things and made his intent less than clear. Mathis's statement that "I think I should ask a lawyer first because I don't know what I should do," is not an outright request for counsel.  Moreover, he followed up by asking if he could "get a lawyer now," a statement that can reasonably be understood as asking about the logistics of when he would see an attorney *if* he were to request one.   And while Mathis's statement that "I'd rather like a lawyer here now," suggests that he might be interested in talking to an attorney before proceeding, Mathis immediately changed course after Dyer told him that they did not have an attorney on call who

12

would come to the Sheriff's office on a weekend. In our view, a reasonable officer considering these statements together and in context would have understood, at most, that Mathis *might* be asking for an attorney. Nonetheless, the mere possibility that Mathis was requesting counsel is not enough to require an end to the questioning. *See Davis*, 512 U.S. at 459 ("[I]f a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, our precedents do not require the cessation of questioning.").

To the extent that Mathis believes the officers should have endeavored to clarify whether he was in fact invoking his right to counsel, their failure to do so does not require suppression of his statements. As the Supreme Court explained in *Davis*,

> when a suspect makes an ambiguous or equivocal statement it will often be good police practice for the interviewing officers to clarify whether or not he actually wants an attorney. . . . Clarifying questions help protect the rights of the suspect by ensuring that he gets an attorney if he wants one, and will minimize the chance of a confession being suppressed due to subsequent judicial second-guessing as to the meaning of the suspect's statement regarding counsel. But *we decline to adopt a rule requiring officers to ask clarifying questions. If the suspect's statement is not an unambiguous or unequivocal request for counsel, the officers have no obligation to stop questioning him.*

*Id.* at 461-62 (emphasis added).

Accordingly, we conclude that only Mathis's statement to Detective Dyer that "I need, I wanna get a lawyer first" was an unambiguous invocation of his

13

right to counsel.  Because Dyer terminated the interview at that point and did not further interrogate Mathis, there was no *Edwards* violation and the district court properly denied the motion to suppress.

### III.

Mathis next challenges the district court's decision to admit evidence of the Wolfer shooting under Rule 404(b) of the Federal Rules of Evidence.  We review the district court's evidentiary ruling under the deferential abuse-of-discretion standard.  *See, e.g.*, *United States v. Frediani*, 790 F.3d 1196, 1199-1200 (11th Cir. 2015).

Mathis filed a motion in limine seeking to exclude the evidence under Rule 404(b), which provides that "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character."  Fed. R. Evid. 404(b)(1).  The government contended that the evidence was intrinsic to the charged crime and therefore outside the scope of Rule 404.  *See United States v. McNair*, 605 F.3d 1152, 1203 (11th Cir. 2010)  ("Rule 404(b) does not exclude evidence that is inextricably intertwined with evidence of the charged offense." (internal quotation marks omitted)).  The government also argued that, if Rule 404(b) applied, the evidence was admissible as proof of "motive, opportunity, intent, preparation, plan, knowledge, identity, [or] absence of mistake."  Fed. R.

14

Evid. 404(b)(2).  The district court denied the motion and held that evidence of Wolfer's murder was admissible because it was "inextricably intertwined with the evidence proving both counts of possession of ammunition by a convicted felon."

Mathis presses this argument on appeal.  He argues that the evidence was not sufficient to connect the Wolfer evidence to the § 922(g) counts and that the Wolfer evidence therefore was not intrinsic to the charged offenses.  Mathis contends that the Wolfer evidence was offered only to show his criminal propensity, which is prohibited by Rule 404.  We disagree.

"The admissibility of evidence of uncharged conduct depends on whether the evidence is extrinsic or intrinsic to the charged offense."  *United States v. Shabazz*, 887 F.3d 1204, 1216 (11th Cir. 2018).  Intrinsic evidence of uncharged bad conduct is "outside the scope of Rule 404(b)," *United States v. Ford*, 784 F.3d 1386, 1394 (11th Cir. 2015), and is therefore admissible "as long as it satisfies the requirements of Rule 403," *Shabazz*, 887 F.3d at 1216.  Extrinsic bad-conduct evidence, however, is inadmissible under Rule 404(b) "unless the evidence is offered for some purpose other than proving the defendant's character."  *Id.*  We agree with the district court that the Wolfer evidence was intrinsic to the charged offenses.

Evidence is intrinsic to the charged offense if it is "(1) an uncharged offense which arose out of the same transaction or series of transactions as the charged

offenses, (2) necessary to complete the story of the crime, or (3) inextricably intertwined with the evidence regarding the charged offenses." *Id.* (internal quotation marks omitted).  The Wolfer evidence arose out of the same events giving rise to the first § 922(g) count, as the two cartridge casings Mathis was charged with possessing were the casings found at the scene of the Wolfer murder. The Wolfer evidence was necessary to tell the story of the charged offenses, as the recovery of the spent casings could not have been explained without discussion of the parking-lot shooting of Wolfer in his van.  The story of the Wolfer shooting, including the evidence of Mathis's car following Wolfer's van all the way from the liquor store, to the Walmart parking lot, and then towards Wolfer's home, was necessary to explain to the jury how the police connected Mathis to the casings found at the scene.  That story was also necessary to explain why the police obtained a warrant to search Mathis's room, where they found the intact ammunition forming the basis of count two of the indictment.  The evidence of the Wolfer shooting was thus "linked in time and circumstances with the charged crime [and] form[ed] an integral and natural part of an account of the crime to complete the story of the crime for the jury." *McNair*, 605 F.3d at 1203 (internal quotation marks omitted).

Because the Wolfer evidence is intrinsic to the charged offenses, the only remaining question is whether Rule 403 barred its admission.  Under Rule 403, the

16

district court may exclude otherwise relevant evidence "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.

Mathis contends that the evidence of Wolfer's murder was unduly prejudicial and should have been excluded under Rule 403 because there was no evidence that Mathis committed or was involved in the murder. We disagree.

Mathis's assertion that the evidence was insufficient to connect him to the murder borders on frivolous. Video from security cameras and Lighthouse Point's license-plate-camera system showed Mathis's car at Wolfer's liquor store shortly before closing. His car followed Wolfer's van from the liquor store to Walmart and remained in the parking lot while Wolfer shopped. When Wolfer left Walmart and headed for home, Mathis's car followed right behind. The Lighthouse Point camera system showed the car driving out of town shortly after a witness heard gunshots in the condominium parking lot. Spent casings of an unusual brand of ammunition were found at the scene of the shooting, and an intact round of the same brand of ammunition was found in Mathis's bedroom. Markings on the spent casings and the intact round indicated that they had been housed in the same magazine or firearm. In the hours after the shooting, multiple internet searches were conducted on Mathis's cell phone looking for information about recent

17

shootings in Broward County and how to obtain a new Florida license plate.   This

evidence was more than sufficient to connect Mathis to the Wolfer shooting and,

ultimately, to the ammunition giving rise to the § 922(g) charges.

While the evidence of the Wolfer shooting was certainly prejudicial,

"relevant evidence [in a criminal trial] is inherently prejudicial; it is only when

*unfair* prejudice *substantially* outweighs probative value that the rule permits

exclusion."  *United States v. King*, 713 F.2d 627, 631 (11th Cir. 1983).  As this

court has explained, "Rule 403 is an extraordinary remedy that must be used

sparingly because it results in the exclusion of concededly probative evidence."

*United States v. US Infrastructure, Inc.*, 576 F.3d 1195, 1211 (11th Cir. 2009).

> Thus, in cases where this Court has found other acts evidence
> inextricably intertwined with the crimes charged, the Court has
> refused to find that the evidence should nonetheless be excluded as
> unduly prejudicial, even when the other acts included evidence of
> violent crimes such as bank robbery, murder and arson. . . .  [T]he test
> under Rule 403 is whether the other acts evidence was dragged in by
> the heels solely for prejudicial impact.

*Id.* (internal quotation marks omitted).

As indicated above, the Wolfer evidence was not dragged into this case

solely for its prejudicial effect; the evidence was necessary to tell the story of the

crimes for which Mathis was on trial.  Under these circumstances, the district court

did not abuse its discretion by rejecting Mathis's claim that the Wolfer evidence

should be excluded under Rule 403.  *See Shabazz*, 887 F.3d at 1217 (holding that

18

Rule 403 did not require exclusion of intrinsic evidence of uncharged bad conduct); *McNair*, 605 F.3d at 1206 ("Because the other acts evidence was inextricably intertwined with the charged crimes, it was not excludable under Rule 403.").

## IV.

Mathis also contends that the government's evidence was not sufficient to support his convictions and that the district court therefore should have granted his motion for judgment of acquittal.  "We review *de novo* a district court's denial of a motion for  judgment of acquittal. . . . , view[ing] the evidence in the light most favorable to the government, drawing all reasonable inferences and resolving all credibility evaluations in favor of the jury's verdict."  *United States v. Carthen*, 906 F.3d 1315, 1319 (11th Cir. 2018).

According to Mathis, the government failed to prove that Mathis had knowledge of or possessed the casings found at the scene, that he participated in the shooting, or even that he was in the car that followed Wolfer's van.  As to the intact round found in his room, Mathis contends the government failed to prove that he had knowledge of or possessed the ammunition.  These arguments are without merit.

As we have already recounted, the government's evidence showed Mathis's car following Wolfer's van from the liquor store to Walmart and towards Wolfer's

home.  The markings on the unusual ammunition casings found at the shooting matched the markings of the intact round found in Mathis's room, and Mathis's DNA was present on the ammunition found in his room.  Internet searches were conducted on Mathis's cell phone in the hours after the shooting looking for information about recent shootings in the area.  Although this evidence does not directly establish Mathis's presence in the car or involvement in the shooting, Mathis himself told the officers that he was in his car and in possession of his cell phone on the night of the murder.  The evidence was thus sufficient to permit a reasonable jury to conclude that it was Mathis driving his own car and using his own cell phone, and to conclude that Mathis possessed the ammunition used to kill Wolfer and the ammunition found in his room bearing his DNA.

Accordingly, we conclude that the government's evidence was sufficient to support the jury's verdict and that the district court therefore properly denied Mathis's motion for judgment of acquittal.  *See Carthen*, 906 F.3d at 1319 ("To uphold the denial of a motion for judgment of acquittal, we need only determine that a reasonable fact-finder could conclude that the evidence established the defendant's guilt beyond a reasonable doubt." (internal quotation marks and brackets omitted)).

V.

Mathis also appeals his sentence, challenging the procedural and substantive reasonableness of the 240-month sentence imposed by the district court.   We review the reasonableness of a sentence under a deferential abuse-of-discretion standard.  *See United States v. Cubero*, 754 F.3d 888, 892 (11th Cir. 2014).

A.

Section 2K2.1 of the Sentencing Guidelines sets a base offense level of 20 for defendants convicted under § 922(g) who have one prior conviction for a crime of violence or controlled substance offense.  *See*  U.S.S.G. § 2K2.1(a)(4)(A). However, if  the defendant used or possessed the firearm or ammunition in connection with another offense that resulted in death, the district court is directed to apply the "most analogous offense guideline" for homicide offenses, if application of that guideline yields a higher offense level.  U.S.S.G. § 2K2.1(c)(1)(B).

The presentence report recommended application of the first-degree murder guideline, U.S.S.G.  § 2A1.1, which "applies in cases of premeditated killing"  and carries a base offense level of 43.  U.S.S.G.  § 2A1.1, comment. (n.1).  The district court agreed that § 2A1.1 was the most analogous guideline.  The court explained:

> I heard a first-degree murder case.  I mean he was charged in federal
> court with possession of ammunition, but the case was a first-degree
> murder case.  And that's what I think the government proved.  And I
> think that's what the jury found Mr. Mathis guilty of.  I don't think the

21

jury would have come back with a guilty verdict unless they believed that he was there either assisting the shooter or being the shooter himself.

The circumstantial evidence in this case was very, very strong. You know, they pretty much tracked Mr. Mathis in his car all the way up to the shooting and away from it. His actions afterwards were consistent with someone who committed the crime. The same type of spent ammunition is found in his bedroom afterwards. I think it was a very strong circumstantial evidence case.

The Guidelines recommend a life sentence for a defendant with a total offense level of 43. However, because § 922(g) offenses carry a statutory maximum sentence of 10 years, the advisory Guideline sentence for Mathis was a total sentence of 240 months. See U.S.S.G. § 5G1.1(a) ("Where the statutorily authorized maximum sentence is less than the minimum of the applicable guideline range, the statutorily authorized maximum sentence shall be the guideline sentence."); *id.* § 5G1.2(d) ("If the sentence imposed on the count carrying the highest statutory maximum is less than the total punishment, then the sentence imposed on one or more of the other counts shall run consecutively, but only to the extent necessary to produce a combined sentence equal to the total punishment."). The district court sentenced Mathis to 120 months' imprisonment on each count and ordered the sentences to be served consecutively, for a total sentence of 240 months.

B.

We turn first to the question of procedural reasonableness.  A sentence is procedurally unreasonable if, *inter alia*,  the district court  "improperly calculates the Guidelines range . . . [or]  selects a sentence based on clearly erroneous facts." *United States v. Gonzalez*, 550 F.3d 1319, 1323 (11th Cir. 2008) (per curiam). Mathis contends that the district court erred by cross-referencing the first-degree murder guideline when calculating Mathis's base offense level.  We disagree.

"We review a district court's interpretation and application of the Sentencing Guidelines *de novo* but accept the court's factual findings unless they are clearly erroneous." *Ford*, 784 F.3d at 1396.  The district court's factual determination that Mathis was involved in Wolfer's murder is not clearly erroneous.

While Mathis again insists that "there was no nexus between Mr. Mathis's conviction for possession of ammunition and the homicide," that argument is no more persuasive here than it was in Mathis's challenges to his conviction.  As we have already explained, the government proved Mathis's possession of the ammunition through evidence of Wolfer's murder -- Mathis's car was tracked from the liquor store to Wolfer's home; spent casings from an unusual brand of ammunition were found at the scene of the shooting and matched an intact round found in Mathis's bedroom.  That evidence was sufficient to support the jury's determination that Mathis possessed the ammunition found at the scene of the

23

shooting and in his bedroom, and it is also sufficient to support the district court's determination that Mathis used the ammunition in the premeditated killing of Karl Wolfer. *See United States v. Ellisor*, 522 F.3d 1255, 1273 n.25 (11th Cir. 2008) (explaining that a sentencing court's factual findings may be based on "evidence heard during trial" (internal quotation marks omitted)). The district court therefore did not err by cross-referencing the first-degree murder guideline, and we reject Mathis's claim that his sentence was procedurally unreasonable.

C.

Mathis also challenges the substantive reasonableness of his sentence. "The party challenging a sentence has the burden of showing that the sentence is unreasonable in light of the entire record, the § 3553(a) factors, and the substantial deference afforded sentencing courts." *United States v. Rosales-Bruno*, 789 F.3d 1249, 1256 (11th Cir. 2015). "A district court abuses its considerable discretion and imposes a substantively unreasonable sentence only when it '(1) fails to afford consideration to relevant factors that were due significant weight, (2) gives significant weight to an improper or irrelevant factor, or (3) commits a clear error of judgment in considering the proper factors.'" *Id.* (quoting *United States v. Irey*, 612 F.3d 1160, 1189 (11th Cir. 2010) (en banc)).

Mathis asserts that his 240-month sentence is unreasonable because it was longer than necessary to serve the relevant sentencing goals. *See* 18 U.S.C. §

24

3553(a) (requiring the district court to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing set out in § 3553(a)(2)).   Beyond stating that a 120-month sentence would have been "more than adequate to punish, deter and rehabilitate," Mathis does not develop his argument or cite any authority supporting his claim that the sentence was unreasonable.   Even if we assume that this approach does not amount to a waiver or abandonment of the issue, *see, e.g.*, *United States v. Woods*, 684 F.3d 1045, 1064 n.23 (11th Cir. 2012) (per curiam) (explaining that defendant abandoned an issue "by failing to develop any argument on it in his opening brief"), we find the claim to be without merit.

Although Mathis was convicted of possessing ammunition, the offense in this case was much more serious than in a routine felon-in-possession case, given that Mathis possessed the ammunition in connection with a premeditated murder. Moreover, Mathis committed this offense just two years after being released from a 15-year sentence for manslaughter, an offense that also involved a shooting. Under these circumstances, we cannot say that the district court "committed a clear error of judgment in weighing the factors by arriving at a sentence outside the range of reasonable sentences dictated by the facts of the case." *United States v. Alberts*, 859 F.3d 979, 985 (11th Cir. 2017) (internal quotation marks omitted).

Mathis has failed to show that the district court abused its discretion in sentencing him to 240 months' imprisonment, and we therefore affirm his sentence.

VI.

In sum, we find no merit in Mathis's challenges to his conviction or sentence. Accordingly, for the foregoing reasons, the judgment of the district court is hereby affirmed.

**AFFIRMED**