[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 19-12517
Non-Argument Calendar

_____

D.C. Docket No. 3:14-cr-00107-RV-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

LARRY DRESEAN BRYANT,
a.k.a. Larry Dreshan Bryant,
a.k.a. Larry Dre'Sean Bryant,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Florida

_____

(April 14, 2020)

Before MARTIN, FAY and HULL, Circuit Judges.

PER CURIAM:

Larry Bryant appeals the district court's revocation of his supervised release and its imposition of a 24-month term of imprisonment. On appeal, Bryant challenges: (1) the district court's finding that Bryant violated a condition of his supervised release by committing a state crime; and (2) the procedural reasonableness of his sentence. After review, we affirm.

## I.  BACKGROUND

### A.    2015 Federal Conviction and Sentence

After a guilty plea, Bryant was convicted of making false statements in the attempted acquisition of a firearm. The district court sentenced Bryant to 33 months' imprisonment and 3 years of supervised release.

The facts of Bryant's federal firearm offense involved Bryant's attempt to buy a 12 gauge shotgun at a pawn shop in Pensacola, Florida. In doing so, Bryant lied on an ATF form by stating that he had never been convicted of a felony for which the judge could have imposed a prison sentence of more than one year and that he had never been a fugitive from justice. In fact, in 1999, when Bryant was 18 years old, he was convicted in Washington state of second-degree attempted murder, for which he had received a 175.5-month prison sentence. After being released from Washington state custody and placed on probation, Bryant absconded. On February 25, 2014, Bryant's Washington state probation officer

2

sought a bench warrant for Bryant's arrest.  That arrest warrant was still outstanding when Bryant committed the federal firearm offense in Pensacola.

After being release from prison again, Bryant began his three-year supervised released term on May 19, 2017.  As mandatory conditions of his supervised release, Bryant was prohibited from committing another federal, state, or local crime, from unlawfully using controlled substances, and from possessing a firearm, destructive device, or any other dangerous weapon.  In addition, Bryant was required to submit to periodic drug tests and was prohibited from associating with convicted felons.

## B.    Petition for Revocation of Supervised Release

On August 3, 2018, Bryant's federal probation officer petitioned the district court for Bryant's arrest and to revoke his supervised release.  The petition alleged that Bryant had violated the conditions of supervised release by: (1) testing positive for marijuana in May 2018; (2) committing a state crime on July 31, 2018, in connection with the stabbing of Damien Pressley and the robbery of Pressley and Michaela Young, for which Bryant was charged in Florida court with (attempted) murder not premeditated during specific felony and robbery with a firearm or other deadly weapon; and (3) also on July 31, 2018, associating with a convicted felon, Gabriel Discepolo, who drove Bryant from the scene of the charged state crimes.

3

## C.    Revocation Hearing

After Bryant was taken into federal custody, the district court held a revocation hearing on June 18, 2019.  Bryant did not contest Violations 1 and 3. As to Violation 2, Bryant pointed out that the state charges had been dismissed. Bryant did not dispute that he had an "altercation" with Pressley (who was stabbed) and Young but contended that Pressley was the attacker and that Bryant merely acted in self-defense in stabbing Pressley and did not commit a state crime.

To prove Violation 2, the government presented testimony from Micky Caudell, a deputy in the robbery/homicide unit of the Escambia County Sheriff's Office, and Damien Pressley, the stabbing victim.  According to Deputy Caudell, on July 31, 2018, another deputy responded to a call at a convenience store, where he met Young and Pressley.  Pressley had multiple stab wounds, including to his neck, and was taken to the hospital.  Young told the deputy that defendant Bryant had stabbed Pressley at her sister's home.

Deputy Caudell investigated and confirmed there was a crime scene at the home.  Deputy Caudell obtained a search warrant for the home, which was a trailer, and found the living room was in disarray, with blood on several items of clothing, couch cushions, the floor, and the walls.  Deputy Caudell did not find a weapon, but he did find a meat tenderizer on the floor.

4

Deputy Caudell interviewed Young, who said that Bryant had recently separated from his wife and was staying at her sister's trailer. Young told Deputy Caudell that Bryant had contacted her to meet him at the trailer so he could collect his clothing. When Young and her boyfriend Pressley arrived, Bryant was already inside the trailer collecting his items. Young and Pressley walked inside, and Pressley sat on the couch while Bryant entered and exited several times carrying clothing out of the trailer. On his final exit, Bryant stopped and began hitting Pressley and then pulled out a knife and stabbed Pressley several times. Young maintained that no words were exchanged between Pressley and Bryant and that she did not know why Bryant attacked Pressley. Young grabbed a meat tenderizer from the kitchen and hit Bryant with it several times in an effort to stop him. Young also tried to call 9-1-1 with her cell phone, but Bryant took the phone from her and fled the scene. Bryant left in a white Chrysler 300 with a white, male passenger. Young then drove Pressley to the nearest store to call the police.

Several hours later, another deputy conducted a traffic stop of a white Chrysler 300. Gabriel Discepolo, a white male with an outstanding warrant, was driving the car, and Bryant was a passenger. Both men were detained, and Deputy Caudell interviewed them. After being advised of his Miranda rights, Bryant admitted to Deputy Caudell that he was at the trailer earlier in the day, before dark, to retrieve his clothing, but had left before any incident and was with his wife for

5

the rest of the night.  Discepolo, on the other hand, told Deputy Caudell that he and Bryant went to the trailer at night, that he sat in the car while Bryant retrieved his clothes, and that, when Bryant returned, he appeared nervous and told Discepolo that Pressley "had tried to put hands on his girl."

The next morning, Deputy Caudell met with Bryant's wife at the hotel where she and Bryant had been staying.  After obtaining permission to search the hotel room, Deputy Caudell found a bag containing a knife and bloodstained clothing.  He also found Young's cell phone in Bryant's hotel room.  Deputy Caudell seized defendant Bryant's cell phone and, after obtaining a search warrant, retrieved historical location data from the cell phone that indicated Bryant was at the trailer at the time the stabbing occurred, which was inconsistent with Bryant's statement that he was at the trailer before dark.

On cross-examination, Deputy Caudell acknowledged that Young made several false statements during his investigation.  For instance, when Young first reported the attack on Pressley, she provided a false name because there was an active arrest warrant for her.  In addition, although Young claimed the trailer was owned by her sister, it was actually owned by Leila Sanchez, who was not Young's sister and was in jail at the time of the attack.  Finally, Young told Deputy Caudell that Bryant had taken Pressley's wallet and cell phone, but those items were later found either in Young or Pressley's car or in the trailer.

Pressley testified that on July 31, 2018, he took his girlfriend Young to the trailer, where they let Bryant in to get his clothes, which he did.  Pressley explained that the owner of the trailer was Young's best friend, but that they called each other sisters.  Pressley did not want to go to the trailer, but Young said that Bryant was threatening to kick down the door if they did not let him in.  After Pressley and Young arrived, Pressley sat down and started to play with his phone. Pressley admitted that he was aggravated and that he and Young were arguing because he wanted Bryant to hurry up so he could go home and go to sleep. However, Pressley denied touching Young.  Bryant exited the trailer with some of his things and took them to the car.  When Bryant re-entered the trailer, he attacked Pressley, cutting him on his neck.  Pressley did not know why Bryant attacked him and did not fight back.  Pressley remembered Young screaming and then he blacked out and woke up in the hospital.

On cross-examination, Pressley admitted that about a month after the stabbing, he was arrested as a result of a domestic violence incident involving Young and was convicted of battery.

Bryant's probation officer also testified and confirmed that: (1) in May 2018, Bryant tested positive for use of marijuana; (2) that Bryant was arrested in connection with the stabbing and charged with attempted murder and robbery with a firearm; and (3) that Discepolo, who was driving Bryant in the white Chrysler

7

300, was a convicted felon with whom Bryant did not have permission to have contact.

As for the stabbing incident, the probation officer said that Bryant called him on July 24, 2018 to tell him that Bryant and his wife were splitting up and Bryant would try to get a hotel room for the night. The next day, Bryant called again and said that he would be living at the trailer with a woman he had met after breaking up with his wife. On the morning of July 31, 2018, the probation officer tried to perform a home visit at the trailer, but Bryant was at work. The probation officer went to Bryant's work to speak with him. Bryant explained to the probation officer that the woman, whom Bryant did not identify, knew he needed a place to stay and had offered him a room, but Bryant also indicated he was in a romantic relationship with the woman. Although Bryant did not name the woman, the probation officer later concluded Bryant was referring to Young, not to the registered owner of the trailer.

Bryant testified in his own behalf about the July 31, 2018 stabbing. According to Bryant, after a July 24, 2018 argument with his wife, he moved out of their home and slept in his car. The next night, Bryant met Young, who invited him to stay at her sister's trailer until her sister got out of jail. After Bryant moved into the trailer, Young, who did not have a car, began texting him for rides and told Bryant she prostituted herself for money to buy crack cocaine. Bryant decided he

8

needed to leave the trailer.  On July 30, Bryant and his wife reconciled and stayed in a hotel room, after which he texted and called Young to let her know he needed access to the trailer to get his belongings.

Because Young did not have a key to the trailer, she and Bryant had been entering the trailer by "popping" the door open.  Bryant did not attempt to get his belongings without Young because she had told him not to go to the trailer without her.

Bryant and Discepolo drove to the trailer, where they met Young and Pressley, whom Bryant did not know.  Bryant followed Young and Pressley into the trailer, grabbed his belongings, and took them to the car, where Discepolo was waiting.  Bryant testified that as he returned for a load of dirty clothes in the laundry room, he saw Pressley grab Young by the throat, throw her up against a wall, and say, "Bitch, you trying to play me?"  Bryant said he dropped the clothes and shoved Pressley off of Young, at which point the two men began fighting.  Bryant heard Young say, "Get off of him," and Bryant was hit in the back.  Bryant turned around, saw Young, and thought she had a hammer.  Believing both Pressley and Young were attacking him, Bryant shifted to face them both, pulled out his knife, and stabbed Pressley.  Bryant testified that he felt he had no other option but to use his knife and that his objective was to get out of the trailer.

9

When Young took out her phone and said she was going to call the police, Bryant took her phone, grabbed his clothing from the floor, and ran out of the trailer and to his car. However, Pressley's car was blocking Bryant's car in the driveway. According to Bryant, Young came out of the trailer, moved Pressley's car, thanked Bryant, and told him, "Get out of here."

Bryant tried to drive away but was driving too erratically, so Discepolo took over and drove Bryant back to the hotel where his wife was waiting. As they drove, Discepolo asked Bryant what had happened, and Bryant told him, "He tried to put hands on his girl." At the hotel, Bryant showered, put the clothes he had been wearing in a bag by the wall, and left with Discepolo. Discepolo took Bryant to an associate's house, where they "smoked spice" so Bryant could "get [his] mind right." Bryant said he did not tell his wife what had happened because he did not want to involve her.

Bryant admitted that he lied in his post-arrest interview about being at the trailer that night, explaining that he was scared about what could happen. Bryant explained that he thought he "was probably going to be sitting in a cell for the rest of [his] life" because he had "just gotten out of prison not too long ago," he was a

convicted felon, and "something like this had already happened in [his] past" when he stabbed a woman in Washington.[1]

After Bryant finished testifying, the defense introduced exhibits showing the criminal histories of Pressley and Young. Among other convictions, Pressley had five battery convictions and a conviction for aggravated assault with a deadly weapon. Young had, among others, two convictions for passing counterfeit money and two convictions for providing false names to law enforcement, one of which stemmed from the July 31, 2018 incident.

## D.    District Court's Revocation of Supervised Release and Sentence

After hearing the parties' arguments, the district court found by a preponderance of the evidence that Bryant had committed all three violations alleged in the probation officer's petition. As to Violation 2 in particular, the district court found that "the credibility determinations have to go against Mr. Bryant in this case" because "[a]ll the evidence, considered in totality, weighs against his version that he's put out here today." The district court observed that it was "pretty clear that [Bryant] stabbed Mr. Pressley numerous times and with the possibility that it would have been fatal for Mr. Pressley, considering the nature of the wounds and the number of wounds and where they were located." The district

---

[1]According to Bryant's Presentence Investigation Report, his 1999 attempted murder conviction arose from an incident in which Bryant stabbed multiple times, including in the neck, a woman he had recently begun living with.

11

court also found that Bryant did not act in self-defense and that the stabbing was an act of aggression.

The district court determined that Violation 2 was a Grade A violation, which, with a criminal history category of III, yielded an imprisonment range of 18 to 24 months for all three violations. The district court noted that Bryant's maximum prison term was 24 months.

In mitigation, Bryant argued, among other things, that Bryant had used deadly force only to defend himself in a life-threatening situation, and that the district court should draw an inference that Young was unreliable from the fact that she did not testify at the hearing. Bryant also pointed out that he had been on supervised release for over a year before reoffending, which he said showed he was not dangerous. Stressing that he had been in state custody for eight months and then federal custody up to the point of the revocation hearing, Bryant asked for time served with no supervision to follow.

Bryant addressed the district court personally and said that he "underst[ood] that in 1999 it was a woman that I stabbed," but that he had "come a long way from where [he] was when [he] was 18 years old." Bryant noted that his wife of two years did not think he was dangerous, and that he was willing to work with his probation officer and seek counseling.

The government argued that Bryant's claim of self-defense was inconsistent with his actions of getting rid of the knife and lying to the police and that Bryant was dangerous.

The district court revoked Bryant's supervised release and sentenced Bryant to 24 months in prison, followed by 12 months of supervised release. The district court imposed two new special conditions of supervised release: (1) that he not possess a knife of any kind; and (2) that he attend an anger management course approved by his probation officer. The district court also stated that Bryant should receive credit for his time in state custody. In choosing the sentence, the district court stated that it had considered "all the sentencing factors in Section 3553(a) of Title 18," the advisory nature of the sentencing guidelines, the Sentencing Commission's policy statements, and this Court's caselaw.

In explaining the chosen sentence, the district court stated that this was a "complex case" that involved "some unsavory people," and that it understood "why some witnesses are not testifying" and "why some things happened." However, the district court also observed that Bryant "has some demons that he has to deal with every day, and I think he's been able to overcome those; but at the same time, they still lurk there, and he needs some help in trying to deal with those." The district court stressed that it had found that Bryant had not acted in self-defense, but as an act of aggression, "which fortunately was not fatal but could

have been and is a very serious offense." The district court also stated that it had considered all of the evidence presented at the hearing and that it was "aware of Mr. Bryant's prior history because [it] sentenced him some years ago."

Bryant did not object to the sentence.

## II.  DISCUSSION

### A.    Revocation of Supervised Release

A district court may revoke a defendant's term of supervised release and impose a term of imprisonment if the district court finds by a preponderance of the evidence that the defendant violated a condition of supervised release.  18 U.S.C. § 3583(e)(3).  We review for abuse of discretion a district court's revocation of supervised release.  United States v. Vandergrift, 754 F.3d 1303, 1307 (11th Cir. 2014).  We review the district court's fact findings at the revocation hearing for clear error.  United States v. Reese, 775 F.3d 1327, 1328-29 (11th Cir. 2015).  We ordinarily will not review the district court's credibility determination made in a revocation proceeding.  United States v. Copeland, 20 F.3d 412, 413 (11th Cir. 1994).

Here, the district court did not abuse its discretion by revoking Bryant's supervised release based on a finding that he committed all three violations.[2] At

---

[2]Bryant does not dispute Violations 1 and 3, which are Grade C violations.  See U.S.S.G. § 7B1.1(a)(3) (providing "any other violation" that is not a crime is a Grade C violation).  With only Grade C violations, Bryant's revocation would have been permissive, rather than

the outset, the district court did not clearly err in finding that Bryant committed a state crime in stabbing Pressley multiple times.  The district court found that Pressley's version of events about the stabbing was more credible than Bryant's version and Bryant has not shown Pressley's account of what happened is facially unbelievable or impossible.  See United States v. Shabazz, 887 F.3d 1204, 1215 (11th Cir. 2018) (explaining that this Court accepts "evidence credited by the district court unless it is contrary to the laws of nature, or is so inconsistent or improbable on its face that no reasonable factfinder could accept it" (quotation marks omitted)).

According to Pressley's testimony, which was corroborated by Young's statement to Deputy Caudell, Bryant stabbed Pressley multiple times without provocation.  Further, it is undisputed that Bryant stole Young's cell phone as he fled the scene, that he initially lied about the knife and his presence at the trailer, and that he actually hid the knife and his bloody clothes.  The totality of the evidence is sufficient to support the district court's finding by a preponderance of the evidence that Bryant's stabbing of Pressley was an act of aggression rather than self-defense and constituted a state crime.  At a minimum, Bryant's conduct, as

mandatory, and Bryant's advisory guidelines range would have been 5 to 11 months' imprisonment, rather than 18 to 24 months.  See id. §§ 7B1.3(a), 7B1.4(a).  For this reason, we must address the merits of Bryant's argument as to Violation 2 because it is a Grade A violation which, with a criminal history category III, yielded an advisory guidelines range of 18 to 24 months for all three violations.

15

found by the district court, constituted aggravated battery with a deadly weapon, in violation of Florida Statutes § 784.045(1)(a)(2), which is a second-degree felony punishable by a prison term of up to 15 years. See Fla. Stat. §§ 775.082(3)(d), 784.045(2).[3]

Although Bryant testified that he stabbed Pressley in self-defense only after he realized both Pressley and Young were attacking him, the district court found this testimony not credible, and this Court defers to the district court's credibility determinations. See Copeland, 20 F.3d at 413; see also United States v. Rodriguez, 398 F.3d 1291, 1296 (11th Cir. 2005) (explaining that a court's fact-finding based on a credibility determination "will almost never be clear error"). Moreover, a reasonable factfinder could find that Bryant's self-defense claim was not credible based solely on Bryant's own version of events, including: (1) Bryant's claim that Young helped Pressley attack him by hitting him with a hammer, but then thanked him and helped him flee by moving Pressley's car; (2) his fleeing the scene with the knife and Young's cell phone; (3) his leaving his bloody clothes, the knife, and Young's cell phone at his hotel room; and (4) his lying to police after he was arrested.

---

[3]The State of Florida charged Bryant with attempted murder not premeditated during a specific felony, in violation of Florida Statutes § 782.04(3), and robbery with a firearm or other deadly weapon, in violation of Florida Statutes § 812.13(2)(a), but apparently later dismissed the charges.

16

Bryant argues that we should not defer to the district court's credibility findings here because they were based on a finding that Bryant "had a propensity for random motiveless knife attacks." This argument fails for two reasons. First, to the extent Bryant is relying on Federal Rule of Evidence 404(b)(1), the Federal Rules of Evidence do not apply in revocation proceedings. United States v. Frazier, 26 F.3d 110, 114 (11th Cir. 1994); see Fed. R. Crim. P. 32.1(b)(2). Moreover, one of the factors a district court must consider before deciding whether to revoke a supervised release term and impose a prison term is "the history and characteristics of the defendant," as reflected in 18 U.S.C. § 3553(a)(1). See 18 U.S.C. § 3583(e)(3).

Second, and in any event, the record belies Bryant's claim that the district court made any sort of propensity finding. In finding Bryant not credible, the district court considered "[a]ll the evidence, considered in totality," and concluded it "weigh[ed] against" Bryant's version of events. In discrediting Bryant, the district court did not refer to, directly or indirectly, Bryant's past crimes, much less any prior knife attack. Indeed, during the revocation hearing, the district court (unlike Bryant himself) never mentioned Bryant's prior attempted murder conviction in Washington state.[4]

_____

[4]To be sure, the district court imposed a special condition of supervised release that prohibits Bryant from possessing any kind of knife during his next supervised release term. But that condition appears to have been motivated by Bryant's testimony at the revocation hearing

17

To support his argument, Bryant points to the district court's statement that it had "considered all of the evidence [it had] heard" and that it was "aware of Mr. Bryant's prior criminal history" from the original sentencing. But the district court made that statement later, when it was explaining its reasons for choosing a 24-month sentence, not when it was explaining its reason for discrediting Bryant. And, as we have already explained, the district court was required to consider Bryant's history, including his criminal history, in determining what sentence to impose upon revocation of supervised release. See 18 U.S.C. §§ 3583(e), 3553(a)(1).

In sum, Bryant has given us no cause to disturb the district court's credibility determinations or its weighing of the evidence with respect to Violation 2. See United States v. McPhee, 336 F.3d 1269, 1275 (11th Cir. 2003) (explaining, in the sentencing context, that "we allot substantial deference" to the factfinder's credibility determinations and "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous" (internal quotation marks omitted)). The district court did not abuse its discretion by revoking Bryant's supervised release based on a finding that he committed all three alleged violations.

---

that he did not know that the condition of his supervised release prohibiting him from possessing "other dangerous weapon[s]" meant that he could not carry a knife. To the extent Bryant was ever really unclear about the scope of that condition, the district court has now made it explicit.

18

## B.    Procedural Reasonableness of the Sentence

Before imposing a prison term upon revocation, the district court must consider certain factors in 18 U.S.C. § 3553(a).  See 18 U.S.C. § 3583(e).[5]  The district court also must consider the policy statements in Chapter 7 of the Sentencing Guidelines, which provide recommended, non-binding ranges of imprisonment.  See United States v. Silva, 443 F.3d 795, 799 (11th Cir. 2006).

We review a sentence imposed upon revocation for reasonableness. Vandergrift, 754 F.3d at 1307.  Our reasonableness review applies the deferential abuse of discretion standard.  United States v. Trailer, 827 F.3d 933, 935 (11th Cir. 2016).  We first examine whether the district court committed any significant procedural error and then whether the sentence is substantively unreasonable in light of the totality of the circumstances and the relevant § 3553(a) factors.  United States v. Pugh, 515 F.3d 1179, 1190 (11th Cir. 2008).  When a defendant did not raise the procedural error at the time of sentencing, our review is for plain error. Vandergrift, 754 F.3d at 1307.

---

[5]Specifically, in a revocation proceeding, the relevant factors the district court must consider are: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to afford adequate deterrence, protect the public, and provide the defendant with needed educational and vocational training and medical care; (3) the Sentencing Guidelines range and pertinent policy statements of the Sentencing Commission; (4) the need to avoid unwarranted sentence disparities; and (5) the need to provide restitution.  See 18 U.S.C. § 3583(e) (cross-referencing 18 U.S.C. § 3553(a)(1), (a)(2)(B)-(D), (a)(4)-(7)).

19

Bryant makes only one argument as to why his sentence is unreasonable. Bryant contends that the district court relied on an impermissible factor to determine his sentence, specifically the concerns in § 3553(a)(2)(A), which include the need for the sentence to reflect the seriousness of the offense, promote respect for the law, and provide just punishment.  Bryant points out that § 3553(a)(2)(A) is not listed in 18 U.S.C. § 3583(e) as one of the sentencing factors the courts must consider before revoking supervised release and imposing a prison term.

A court's consideration of an improper factor is procedural error. Vandergrift, 754 F.3d at 1308.[6]  Because Bryant did not raise any objection to this alleged error when the district court imposed his sentence, our review is for plain error only.  See id.

The text of § 3583(e) does not include § 3553(a)(2)(A) among the factors district courts must consider, but it also does not "explicitly forbid a district court from considering § 3553(a)(2)(A)."  Vandergrift, 754 F.3d at 1308.  In Vandergrift, the defendant, like Bryant, failed to raise this alleged procedural error at his revocation sentencing and had to demonstrate plain error.  See id. at 1307.  The Vandergrift Court held that because neither the Supreme Court nor this Court has

---

[6]Although Bryant's counseled brief states in passing that his sentence is substantively unreasonable, it does not make any argument as to the substantive reasonableness of his sentence.  Nonetheless, in light of the totality of the circumstances, and given the district court's credibility findings (that Bryant stabbed Pressley multiple times and that Bryant's stabbing was an act of aggression and not in self-defense), we have little trouble concluding that his 24-month sentence, at the top of the advisory guidelines range, is substantively reasonable.

addressed whether consideration of § 3553(a)(2)(A) in a revocation sentence is error, and there is a circuit split on the issue, any error could not be plain. Id. at 1308-09.

Here, Bryant has not shown plain error either. First, we are not persuaded by Bryant's contention that the district court's statement—that it had considered "all" of the § 3553(a) factors—indicates that it relied on the need to "punish" Bryant for his new state crime in choosing a 24-month sentence. Nothing in the revocation record suggests the district court was focused on the need to punish Bryant for stabbing Pressley rather than the need to sanction Bryant for his breach of trust while on supervised release. See U.S.S.G. Ch. 7, Pt. A, intro. cmt. n.3(b) (explaining that the court's goal is to sanction "the defendant's breach of trust" not the defendant's new criminal conduct triggering the violation). Admittedly, the district court stated that Bryant's stabbing of Pressley was "a very serious offense," but the "nature and circumstances" of Bryant's supervised release violation (here, his new state crime) are permissible factors for the district court to consider. See 18 U.S.C. § 3583(e) (cross-referencing § 3553(a)(1)).

In any event, even assuming arguendo that the district court included § 3553(a)(2)(A)'s concerns in its consideration of the appropriate sentence, the district court did not commit plain error because it is still true that neither this

21

Court nor the Supreme Court has held that consideration of § 3553(a)(2)(A) in imposing a revocation sentence is error.  See Vandergrift, 754 F.3d at 1308-09.

Contrary to Bryant's arguments, the Supreme Court's recent holding in United States v. Haymond, ___ U.S. ____, 139 S. Ct. 2369 (2019), does not establish plain error here.  In Haymond, the Supreme Court concluded that 18 U.S.C. § 3583(k), which imposed a mandatory minimum five-year sentence upon revocation of supervised release for certain enumerated offenses, violated the Fifth and Sixth Amendments by allowing judge-found facts to trigger a mandatory minimum sentence.  See Haymond, ___ U.S. at ___, 139 S. Ct. at 2374, 2378, 2384-85.  In other words, Haymond addressed an entirely different question and has no bearing on whether it is permissible under § 3583(e) for the district court to consider the factors in § 3553(a)(2)(A).[7]

## III.  CONCLUSION

Bryant has not shown that the district court abused its discretion in revoking his term of supervised release or that his 24-month revocation sentence is procedurally unreasonable.

**AFFIRMED.**

---

[7]The Supreme Court in Haymond was concerned with the district court's fact findings that increase the mandatory minimum prison term under § 3583(k) and explicitly stated that its holding did not extend beyond § 3583(k).  See id. at ___, 139 S. Ct. at 2383-84 (noting specifically that § 3583(e) does not contain any similar mandatory minimums triggered by judge-found facts).

22